SIXTH DIVISION
September 29, 2006

No. 1-05-3023

| | | |
|---|---|---|
| THE FILM AND TAPE WORKS, INC., an Illinois Corporation, and JIM MAHONEY, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiffs-Appellants, | ) | |
| v. | ) | No. 02 CH 16214 |
| | ) | |
| JUNETWENTY FILMS, INC., f/k/a Bayard Productions, Inc., an Illinois Corporation, FRANK ALBERSON and CHRISTOPHER BAYARD, | ) ) ) ) | Honorable Mary Anne Mason, Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiffs, The Film and Tape Works, Inc. and Jim Mahoney (hereinafter collectively FTW) filed a seven-count second amended complaint against defendants, Junetwenty Films, Inc. (Junetwenty), Frank Alberson and Christopher Bayard, alleging the following claims: violation of the Computer Fraud and Abuse Act of 1986 (18 U.S.C. §1030 *et seq.* (2000)) (count I); misappropriation of trade secrets (count II); tortious interference with prospective economic advantage (count III); breach of duty of loyalty (count IV); conversion (count V); common law unfair competition (count VI); and tortious interference with a contract (count VII). Defendants brought a motion to dismiss counts I and VI pursuant to section 2-619(a)(5) of the Illinois Code of Civil Procedure (735 ILCS 5/2-619(a)(5) (West 2004)) on the basis of untimeliness and a motion for summary judgment on all counts pursuant to section 2-1005 of the Illinois Code of

No. 1-05-3023

Civil Procedure (735 ILCS 5/2-1005 (West 2004)). The circuit court granted both motions. Plaintiffs now appeal the circuit court's orders with regard to counts III, V, VI, and VII. For the reasons that follow, we affirm.

## I.  BACKGROUND

Plaintiffs filed their original complaint on September 5, 2002, and a first amended complaint on Mach 7, 2003. On April 19, 2005, plaintiffs filed a second amended complaint in which they alleged the following. FTW had been in the business of sales and rental of videotaping equipment and related services in excess of 20 years. On January 5, 2001, FTW entered into an agreement to purchase the stocks and assets of a company owned by Ken Kreis known as Video Associates, which had been doing business similar to that conducted by FTW for 11 years. As part of the purchase agreement, FTW received Video Associates' customer list. FTW also agreed to hire defendants Bayard and Alberson, who had been employees of Video Associates.

Plaintiffs further alleged that while working for FTW, Bayard and Alberson removed confidential business and customer information from FTW computers without authorization, and attempted to "sabotage" FTW by inputting false information onto the computers. Plaintiffs contended that after resigning from FTW, Bayard and Alberson used the information they removed, which included the identity of customers, contact information, purchasing habits, purchasing histories, and pricing information, for their personal business or in connection with Junetwenty (a corporation formed by Bayard) by "soliciting, advising and consulting" FTW customers, including those customers FTW acquired from Video Associates. Plaintiffs also

2

alleged that while the defendants Bayard and Alberson were working at FTW, they met with FTW customers and started projects that they continued after leaving FTW without informing those customers of their severance from FTW.

Defendants Bayard and Junetwenty filed an answer in which they denied FTW's allegations. They also filed several affirmative defenses including one directed at FTW's claim for interference with prospective economic advantage in which they contended that even if they did interfere with FTW, they were protected against the claim by the competitor's privilege. Alberson filed a separate answer in which he denied FTW's allegations. He also filed the same affirmative defenses as Bayard and Junetwenty.

During the discovery portion of this case several depositions were taken, including those plaintiff Mahoney, defendants Bayard and Alberson, and Blue Cross/Blue Shield (Blue Cross) employees Nadine Zabierek, Nancy Donaldson, and Rita Taylor-Nash. Blue Cross was one of the customers allegedly "stolen" from FTW by defendants and is the only customer specifically discussed in the parties' briefs.

In his deposition, Mahoney stated that defendants Bayard and Alberson did not receive any written employment agreements when they were hired by FTW. He further stated that although Kreis, Video Associates' president, signed a covenant not to compete pursuant to FTW's acquisition of Video Associates, defendants Bayard and Alberson never signed any such covenant.

Mahoney also stated that he was not aware of any long-term contracts Video Associates had with any of its clients, that there generally were no long-term contracts in the video industry,

3

and that, due to the competitiveness of the industry, it was not uncommon for customers to obtain quotes from numerous video companies before starting a job. Mahoney stated that FTW did not "have contracts with its customers," but that over 50% of the company's customers were repeat customers. Mahoney further testified that while working for FTW, Bayard and Alberson met with Blue Cross on FTW's behalf.

In his deposition, Bayard testified that while working at Video Associates he had access to all the company's customer information. He stated that he had worked on several Blue Cross projects while working at Video Associates, but that Video Associates never had any exclusive contracts with Blue Cross. Bayard also acknowledged working on Blue Cross projects while employed at FTW. He stated that he resigned from FTW in May of 2001, at which time he began to do video-related work through his corporation, Junetwenty. Bayard stated that while working at FTW he never had any contact with FTW customers except with regard to FTW projects. He further stated that after leaving FTW, he could not recall whether he contacted Blue Cross, or whether they contacted him. However, he stated that when he first spoke with Blue Cross after leaving FTW, he "let them know where [he] was."

Alberson testified in his deposition that he worked at Video Associates with Bayard and that he had access to Video Associates' customer list. He stated that his employment at Video Associates was at will, that he did not have a written employment contract, and that he never signed a covenant not to compete. He further stated that FTW hired him in February of 2001, after acquiring Video Associates, and that he never received an employee handbook from FTW, never signed any employment contract, and never signed a covenant not to compete. Alberson

4

also acknowledged that some time in the week prior to leaving FTW he downloaded the Video

Associates customer list to his Palm Pilot (or personal digital assistant (PDA)).[1]  However,

Alberson also stated that he never contacted anyone on the Video Associates customer list after

leaving FTW.

Alberson further denied soliciting business for himself prior to resigning from FTW in

May of 2001.  He stated that the week after he left FTW, he worked on a Blue Cross project, the

---

[1]Alberson also discussed his practice of keeping customer information on his Palm Pilot

while at FTW and that it was his practice to update customer information directly onto his Palm

Pilot and then upload that information to the FTW computers so that other employees at FTW

could access the information.   Neither party cites to Alberson's deposition for this point.  In fact,

plaintiffs do not cite Alberson's deposition at all, and they have not appealed their claims in

counts I and II regarding the defendants' alleged "sabotage" of FTW's computer systems through

the use of a Palm Pilot.

"HIPPA video," as an independent contractor for Bayard's company, Junetwenty. He stated that Bayard called him about the job the day before it started and that he did not know how Bayard had procured the job. He further stated that after leaving FTW he never dealt with anyone at Blue Cross directly, but only through Bayard.

Also relevant to the appeal are the depositions of several Blue Cross employees. Nadine Zabierek testified that she was in charge of hiring video production personnel for Blue Cross's "HIPPA" project in 1999 and 2000. She said that someone at Blue Cross recommended Bayard because he had done video work for previous Blue Cross projects. Zabierek further stated that she was not unaware of either Video Associates or FTW prior to that time and she was unaware of Bayard's employment situation when she hired him for the project. She stated that upon the recommendation of Bayard, she sent him a proposal for the "HIPPA" project at his Video Associates address. When asked about the proposal being addressed to Video Associates/FTW, Zabierek stated: "[f]rom my perspective we were working with Chris Bayard, and we were requesting everything from Chris Bayard regardless of how it was addressed." She also stated: "[a]ll of my dealings were with Chris Bayard. I hired Chris Bayard. What his employment relationship was, I don't know; and frankly, I didn't care." She stated that she used Bayard because "everyone said Chris Bayard is a really good video guy, why don't you bring him in, why don't you talk to him." She also stated that she was unaware that FTW had purchased

Video Associates.

Nancy Donaldson testified that she was a "compliance director" at Blue Cross. She stated that she first hired Bayard to do video work for Blue Cross in 1999 after someone recommended him and Video Associates. She stated that she was aware that Bayard changed employment from Video Associates to FTW at some point, but that she was not sure when that occurred. Donaldson also stated that she recommended Bayard to Zabierek.

Finally, Blue Cross employee Rita Taylor-Nash stated she had been the director of corporate diversity at Blue Cross since 2001. She stated that she worked with Bayard in 2001 on the "Diversity" video. She stated that she was aware that Video Associates was acquired by FTW but she stated that she did not know when the acquisition occurred. She stated that she was not aware who Bayard was working for when she first contacted him, but that he was recommended based on other work he had done for Blue Cross. She also stated that at the time she worked with Bayard she was not concerned with where he was employed.

On May 9, 2005, defendants filed their motions for summary judgement and dismissal. On August 12, 2005, the circuit court issued its 11-page memorandum opinion and order. With respect to count I, the court granted defendants' motion to dismiss as it applied to Bayard, and defendants' motion for summary judgment as applied to Alberson and Junetwenty. With respect to count VI, the court granted defendants' motion to dismiss on the basis of untimeliness as the count applied to all FTW customers other than Blue Cross, because only Blue Cross had been subject to discovery. The court also granted defendants' motion for summary judgment on counts II through VII as applied to all defendants. With respect to count VI, the court found that

discovery had failed to reveal that defendants interfered with FTW's relationship with Blue Cross.

On appeal, FTW contends that the trial court erred in granting summary judgment to defendants on counts III, V, VI, and VII because there were genuine issues of material fact. Additionally, FTW contends that the court also erred in dismissing count VI pursuant to 2-619(a)(5) because the count related back to the original complaint and was, therefore, not untimely despite the fact that it was filed after the running of the applicable statute of limitations. FTW does not allege any errors with regard to count I, II, or IV and we will, therefore, not address those counts.

## II.     ANALYSIS

We first address FTW's appeal of the circuit court's grant of summary judgment. Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits, viewed in light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2004). If a plaintiff fails to establish any element of his claim, summary judgment is appropriate. Dardeen v. Kuehling, 213 Ill. 2d 329, 335, 821 N.E.2d 227, 230-31 (2004). Our review of a grant of summary judgment is *de novo*. Illinois Emcasco Insurance Co. v. Northwestern National Casualty Co., 337 Ill. App. 3d 356, 359, 785 N.E.2d 905, 908 (2003).

As noted, count III of FTW's complaint alleged a tortious interference with prospective business (economic) advantage. FTW contends that it had a business relationship with Blue Cross following the purchase of Video Associates and that the defendants purposefully "stole"

8

the business of Blue Cross when they continued to work on Blue Cross projects after leaving FTW without informing Blue Cross of their change in employment. FTW has not alleged that defendants were paid for work that FTW performed, but merely that defendants wrongfully took its place with respect to Blue Cross's video needs after resigning.

The relational torts of interference with prospective economic advantage and interference with contract are closely related, except that the former requires a mere business expectancy while the latter applies only where there is a legally binding contract between the parties. See Belden Corp. v. Internorth, Inc., 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101 (1980). Accordingly, while interference with a business expectancy in the absence of a binding contract may be privileged where it subserves business competition, interference that induces a breach of a contract where there is a binding contract is not so privileged. See Soderlund Brothers, Inc. v. Carrier Corp., 278 Ill. App. 3d 606, 615, 663 N.E.2d 1, 8 (1995). As stated by this court in Belden Corp., 90 Ill. App. 3d at 551, 413 N.E.2d at 101:

"Both [torts] recognize that a person's business relationships constitute a property

interest and as such are entitled to protection from unjustified tampering by

another. [Citation.] Both causes of action imply a balancing of societal values: an

individual has a general duty not to interfere in the business affairs of another, but

he may be privileged to interfere, depending on his purpose and methods, when

the interference takes a socially sanctioned form, such as lawful competition.

[Citation.] The difference between the two torts is that the tort of interference

with contractual relations affords a greater degree of protection to the parties to a

9

business relationship.  The sacrosanct contractual relation takes precedence over

the conflicting rights of any presumptive interferor, including his right to compete

and his own prospective advantage. [Citation.]"

Moreover:

"When a business relationship affords the parties no enforceable expectations, but

only the hope of continued benefits, the parties must allow for the rights of others.

 They therefore have no cause of action against a bona fide competitor unless the

circumstances indicate unfair competition, that is, an unprivileged interference

with prospective advantage."  Belden Corp., 90 Ill. App. 3d at 552, 413 N.E.2d at

102.

Here, there is evidence that FTW had an existing business relationship with Blue Cross

predicated upon an ongoing course of dealing in providing video services for several months.

However, there is no evidence that either FTW or its predecessor, Video Associates, had an

enforceable contract with Blue Cross.  FTW contends in its appellate brief that Video Associates

had an oral contract with Blue Cross to provide video services, and that FTW acquired rights in

this oral contract upon its acquisition of  Video Associates.  FTW states that it continued to

service Blue Cross based on this oral contract after its acquisition of Video Associates and

before defendants' departure from FTW.  However, FTW does not cite to any evidence or

otherwise describe the terms of this alleged oral contract other than to acknowledge that Blue

Cross was free to terminate the oral contract at any time and that the parties never agreed that

FTW would have the sole right to provide Blue Cross with video services.  In fact, the

uncontradicted testimony of FTW's president, Mahoney, was that FTW did not "have contracts with its customers."  Thus, all FTW could lay claim to is a mere business expectancy.  But even if we were to ignore Mahoney's testimony that FTW did not have contracts with its customers, there would have been, at best, an oral contract that was terminable at will.

Defendants urge that because Blue Cross was free to cease working with FTW at any time, FTW could not have a valid expectancy of any continued relationship.  Defendants are incorrect.  A relationship created by a contract that is terminable at will is sufficient to support a claim of interference with prospective economic advantage because such a relationship "will presumptively continue in effect so long as the parties are satisfied."  Dowd & Dowd, Ltd. v. Gleason, 352 Ill. App. 3d 365, 381, 816 N.E.2d 754, 768 (2004); see also Restatement (Second) of Torts §766, Comment g, at 10-11 (interference with a contract terminable at will is "analogous to interference with prospective contractual relations" because "[o]ne's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance to them"), §766B, Comment c, at 22, and §768, Comment i, at 44 (1979) ("If the third person is free to terminate his contractual relation with the plaintiff when he chooses, there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them").  The Restatement further points out that since a contract that is terminable at will does not provide a future legal right, but only an expectancy, "when the contract is terminated by the choice of the third person there is no breach of it."  Restatement (Second) of Torts §768, Comment i, at 44 (1979).

11

However, we recognize that even though competition will justify interference with a business relationship, if the manner of interference is improper, the interference will be actionable.  See Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460, 485, 693 N.E.2d 358, 371 (1998) ("to prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'–that the defendant has committed some impropriety in doing so"); Restatement (Second) of Torts §766B, Comment a, at 20 (1979) ("In order for the actor to be held liable, this Section requires that his interference be improper"); see also Soderlund Brothers, Inc., 278 Ill. App. 3d at 616, 663 N.E.2d at 8 ("Acts of competition which are never privileged include fraud, deceit, intimidation, or deliberate disparagement").  FTW contends that defendants were guilty of fraud and deceit in their procurement of FTW's customers by failing to inform Blue Cross that they no longer worked for FTW and by continuing to take calls from FTW customers (including Blue Cross) on cell-phones issued to them by FTW.

With regard to FTW's contention that the defendants "stole" Blue Cross projects by failing to inform Blue Cross of their employment status, FTW does not cite to the record for support and does not otherwise point to any evidence that defendants ever improperly misrepresented their employment status.  Bayard testified that he could not recall whether he ever called former Video Associates clients (including Blue Cross) after leaving FTW, or whether those clients contacted him, and he stated that when he first spoke with Blue Cross after leaving FTW, he "let them know where [he] was" – the implication of this statement being that

12

he let Blue Cross know he was no longer with FTW. Alberson testified that after leaving FTW, he never dealt directly with anyone at Blue Cross and never contacted any clients of FTW or Video Associates. Moreover, Blue Cross employee Zabierek testified: "[a]ll of my dealings were with Chris Bayard. I hired Chris Bayard. What his employment relationship was, I don't know; and frankly, I didn't care." Similarly, Blue Cross employee Donaldson testified in her deposition that she was aware that Bayard had changed employment, she just was not sure exactly when she learned that information. Finally, Blue Cross employee Taylor-Nash testified in her deposition that she had no preference whether Bayard worked on the "diversity" project through FTW or on his own. Thus, there is no evidence that defendants misrepresented their employment status to improperly induce any customers to leave FTW. Moreover, it is clear from the uncontradicted testimony of Zabierek, Donaldson, and Taylor-Nash that even if such a misrepresentation had been made, it would have had no effect on FTW's loss of Blue Cross as a client because Blue Cross intended to work with Bayard regardless of how he was employed. In order to be liable, a defendant's interference must cause the loss or, in other words, a defendant's conduct must not only qualify as improper interference, it must also actually induce the third party to terminate its relationship with the plaintiff. See generally W. Keaton, Prosser and Keeton on Torts, §129, at 989-91 (5th ed. 1984); Restatement (Second) of Torts §766B (1979).

With respect to plaintiffs' contention that after departing from FTW, the defendants wrongfully continued to take calls from FTW's customers (including Blue Cross) on cell-phones issued to them by FTW, we note that this allegation was not argued in FTW's initial brief but was raised for the first time in their reply brief. Supreme Court Rule 341(e)(7) sets forth the

13

requirements of the argument section of an appellant's brief, and states that "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."  134 Ill. 2d R. 341(e)(7); see also Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank, 117 Ill. App. 3d 284, 291, 452 N.E.2d 1361, 1366 (1983) (holding that a contention raised for the first time in a reply brief was waived).  Thus, this contention has been waived.  Moreover, even if not waived, this contention would likewise fail on its merits.

Plaintiffs fail to cite to the record in their reply brief to support this allegation.  In the statement of facts section of their initial brief, plaintiffs did cite to Bayard's deposition where he stated that he continued to use his FTW-issued cell-phone after leaving FTW.[2]  However, FTW does not specifically allege or cite to any evidence that Bayard kept the same number on the FTW cell-phone number after he resigned.  Presumably, since FTW provided Bayard with the cell-phone, FTW had a service contract with a cell-phone company.  Thus, it would seem that it would have been within FTW's power to cancel the contract and thereby stop Bayard from receiving calls from any FTW customers via the FTW phone number assigned to that cell-phone, regardless of whether Bayard continued to possess the cell-phone itself.  Moreover, FTW cites to no evidence that defendants actually intercepted calls made by FTW customers intending to contact FTW.  Thus, the only impropriety supported by the record would be that Bayard kept his

---

[2] FTW does not cite to any evidence regarding Alberson's cell-phone use after leaving FTW.

FTW-issued cell-phone after resigning. Although FTW has not alleged that Bayard was required to leave his phone or that FTW made a demand for its return, we would tend to agree that upon termination of employment, an employee would be expected to leave his employer's property behind unless given as a gift. However, although Bayard's retention of the FTW cell-phone may have been unjustified, without more, this type of malfeasance would be wholly collateral and would have no causative connection to defendants' alleged interference with FTW's prospective business. See Restatement (Second) of Torts §766B (1979). In other words, there is no nexus in the record between Bayard's wrongful retention of the cell-phone and FTW's loss of Blue Cross. Therefore, we find that the circuit court was correct to grant summary judgment on this count.

For the same reasons, we also find that the court was correct to grant defendant's motion for summary judgment with respect to count VII, which alleged interference with contract. FTW cites to no additional case or evidence in support of this count. As noted, at best, FTW had an oral contract with Blue Cross that was terminable at will, and such contracts are essentially treated the same as mere business expectancies. See Restatement (Second) of Torts §766, Comment *g*, at 10-11, §766B, Comment *c*, at 22, and §768, Comment *i*, at 44 (1979). Accordingly, the foregoing analysis applies equally to this count.

We next move to count VI, which purports to state a claim for unfair competition. As noted, this count was subject to both summary judgment, at least as to any claim arising from services rendered to Blue Cross, and to a section 2-619 dismissal as to claims for services rendered to any other customers of plaintiff. With regard to the summary judgment, FTW claims, relying on the district court case <u>Zenith Electronics. Corp. v. Exzec, Inc.</u>, No. 93 C 5041

15

(N.D. Ill. 1997), that the common law tort of unfair competition is identical to the tort of interference with prospective economic advantage. Accordingly, FTW urges that just as it is entitled to recover for its tortious interference claims, it is also entitled to recover for its unfair competition claim. In support, FTW points to the same factual allegations of misconduct that it alleged with regard to its tortious interference claims. Since, for the reasons discussed, we have concluded that there is no evidence to support FTW's allegations of interference, we can dispose of the unfair competition claim as well without necessitating any further analysis.

With regard to the section 2-619 dismissal of count VI, as noted, the circuit court granted the motion with respect to any claims resulting from defendants' alleged interference with any of FTW's business relations other than Blue Cross. The circuit court predicated this dismissal on the fact that discovery had already closed and the case was essentially ready for trial, thus precluding defendants from having an adequate opportunity to prepare their defense to that count prior to trial. Secondly, the court held that in the discovery taken with respect to all the other counts, the only evidence of any service performed by defendants with regard to any prior customers of FTW referred solely to Blue Cross. Accordingly, the court held that defendants would have been deprived of any opportunity to take discovery with regard to services performed for any other customer under count VI. For that reason, the court granted defendants' section 2-619 motion on the grounds that this late amendment would be prejudicial to defendants regardless of the similarities between unfair competition and tortious interference with prospective economic relations, as alleged in the original pleading. The trial court then proceeded to grant summary judgment on counts II through VII with respect to all defendants.

16

The rule is clear that a trial court may allow a pleading to be amended after the statute of limitations has run if the original pleading was timely filed with respect to that cause of action or defense and the new matter arises out of the same transaction or occurrence set out in the original pleading. See generally 3 R. Michael, Illinois Practice §26.4 (West 1989). However, such an amendment should not be permitted even if otherwise timely when it would result in prejudice to the defendants. See Loyola Academy v. S & S Roof Maintenance, Inc., 146 Ill. 2d 263, 273, 586 N.E.2d 1211, 1216 (1992) Here, the court predicated its dismissal as to any claimed interference with customers other than Blue Cross by reason of the fact that it would necessitate new discovery since the previous discovery did not reveal any business interaction between defendants and any other customers except Blue Cross. The circuit court held that to permit a new count stating a new action with respect to customers other than Blue Cross would be prejudicial once discovery was closed. This basis for refusing to allow amendments is well entrenched. See, *e.g*., Loyola Academy, 146 Ill. 2d at 273-74, 586 N.E.2d at 1216 (a court does not abuse its discretion in rejecting amendments to pleadings even if otherwise timely where other parties would be prejudiced by virtue of the proposed amendment).

Plaintiffs do not purport to challenge the conclusions of the circuit court that their attempt to file count VI after the close of discovery would prejudice defendants. They only argue that the claim in count VI is sufficiently related to the claims raised in the earlier pleadings, thus implicitly waiving or conceding the resultant prejudice described by the circuit court. Moreover, plaintiffs cannot claim that the close of discovery would not be prejudicial to the defendants because no new facts of any misconduct with regard to any customers would, in

any event, be elicited. Such a contention would, in fact, concede that the new count would warrant the grant of summary judgment in defendants' favor for the same reasons set forth above with respect to plaintiffs interference counts. Thus, even if the trial court did not intend to grant the defendants' motion for summary judgment as to count VI insofar as it pertained to customers other than Blue Cross, relying as to them on its partial section 2-619 dismissal, this court is not precluded from so doing at this time pursuant to Supreme Court Rule 366. 134 Ill. 2d R. 366(a)(5) ("In all appeals the reviewing court may, in its discretion, and on such terms as it deems just, *** (5) enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may require").

Finally, plaintiffs contend that the circuit court erred in granting summary judgment to defendants on count V of their complaint, which alleged conversion. However, FTW does not cite a single case discussing the tort of conversion in support of their argument. We would, therefore, be within our authority to deem the appeal of this count waived. See Pecora v. Szabo, 109 Ill. App. 3d 824, 825-26, 441 N.E.2d 360, 361 (1982) ("[a] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research. [Citations.] Under such circumstances, the reviewing court may deem waived those issues which have not been sufficiently or properly presented"); see also Groenings v. City of St. Charles, 215 Ill. App. 3d 295, 306, 574 N.E.2d 1316, 1323 (1991) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited and logical arguments presented, and arguments not

18

adequately presented on appeal may be waived");134 Ill. 2d R. 341(e)(7). However, FTW does, without citation to any authority, correctly enumerate the elements of the tort of conversion as described by our supreme court in Cirrincione v. Johnson, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998). FTW also argues that these elements apply to the specific facts of this case. Therefore, we choose to address the merits of FTW's conversion claim.

As stated by our supreme court:

"To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." Cirrincione, 184 Ill. 2d at 114, 703 N.E.2d at 70.

In discussing the history and development of the tort of conversion in another case, our supreme court concluded that "the subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived. Money may be the subject of conversion, but it must be capable of being described as a specific chattel." In re Thebus, 108 Ill. 2d. 255, 260, 483 N.E.2d 1258, 1260 (1985). Moreover, as stated in the Restatement (Second) of Torts: "Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights." Restatement (Second) of Torts §242, at 473 (1965). However, intangible property rights cannot be the subject of conversion unless they are merged into a tangible document over which the alleged tortfeasor exercised dominion or ownership. See Restatement (Second) of Torts §242, at 473 (1965); Allied Investment Corp. v.

19

Jasen, 354 Md. 547, 731 A.2d 957 (1999); Maryland Staffing Service, Inc. v. Manpower, Inc., 936 F. Supp. 1494, 1507 (E.D. Wis. 1996) (franchisee could not sustain a claim for the conversion of intangible rights without showing that they were connected to or merged in a specific, tangible object); Northeast Coating Technologies, Inc. v. Vacuum Metallurgical Co., 684 A.2d 1322, 1324 (Me. 1996).

Notably, in discussing the documents in which intangible rights may be merged, the Restatement enumerates "promissory notes, bonds, bills of exchange, share certificates and warehouse receipts, whether negotiable or non-negotiable." Restatement (Second) of Torts §242, Comment *b,* at 473-74 (1965). These documents all share in common the fact that they are tangible documents containing intangible rights which are easily convertible into tangible assets, not dissimilar to currency. Contracts for performance of services or the exchange of goods are conspicuously absent from the Restatement's enumeration. The extension of the tort of conversion is even more inappropriate where the contract is terminable at will and, thus, does not embody any intangible right other than a mere expectancy. In any event, there is no claim made here that, if there is a contract, it is anything but an oral one with no tangible document embodying its content. Thus, as previously indicated, under these circumstances, there is no basis at all upon which to predicate a conversion action. See Restatement (Second) of Torts §242, at 473 (1965); Allied Investment Corp., 354 Md. 547, 731 A.2d 957; Maryland Staffing Service, Inc., 936 F. Supp. at 1507; Northeast Coating Technologies, 684 A.2d at 1324. Therefore, we find that the circuit court was correct to grant summary judgment on this count.

For all the foregoing reasons, we affirm.

Affirmed.

FITZGERALD-SMITH, P.J., and McNULTY, J., concur.