NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DONALD MAC KENZIE, an individual, *Plaintiff/Third-Party Defendant/Appellee,*

*v.*

CHERYL HOWERTON; CHERYL L. HOWERTON, DVM, P.C., *Appellants.*

*v.*

SAMANTHA PAGE and JAKE PAGE; MIDTOWN ANIMAL CLINIC LLC, *Defendants/Third-Party Appellees.*

No. 1 CA-CV 23-0728

FILED 10-17-2024

Appeal from the Superior Court in Coconino County
No. S0300CV202000210
The Honorable Elaine Fridlund-Horne, Judge

**AFFIRMED IN PART; VACATED IN PART AND REMANDED**

COUNSEL

Rose Law Group, PC, Scottsdale
By Shelton L. Freeman, Austin Moylan
*Counsel for Defendants/Appellants*

Aspey, Watkins & Diesel, PLLC, Flagstaff
By Kathryn G. Mahady, Trevor T. Kortsen, Madison A. Johnson
*Counsel for Defendants/Appellees Page, et al.*

---

## MEMORANDUM DECISION

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge Anni Hill Foster and Judge Angela K. Paton joined.

---

**B A I L E Y**, Judge:

**¶1**    Appellants Cheryl Howerton, D.V.M., and Cheryl L. Howerton, D.V.M., P.C. (collectively, "Howerton"), appeal summary judgment on several claims in favor of Appellees Samantha and Jake Page (collectively, "the Pages"), and Midtown Animal Clinic, LLC ("Midtown"). For the following reasons, we affirm in part, vacate in part, and remand.

### FACTS AND PROCEDURAL HISTORY[1]

**¶2**    Howerton owned and operated Alpine Animal Hospital ("Alpine")[2] until 2015, when she sold it to Donald Mac Kenzie, D.V.M. ("Mac Kenzie"). Before buying the practice, Mac Kenzie worked as a veterinarian at Alpine. Mrs. Page worked at Alpine as the office manager and continued to do so after Mac Kenzie bought the practice. Mr. Page began working at Alpine as a veterinary technician in 2016.

**¶3**    As part of the sale, Mac Kenzie leased Alpine's office from Howerton for a five-year term ending April 30, 2020. The sale was structured so Mac Kenzie bought the assets and the goodwill separately. As a result, there were separate contracts, promissory notes, and security agreements for each.[3] Both notes were due May 5, 2020. The collateral

---

[1] In reviewing summary judgment, we view the facts and all reasonable inferences drawn from them in the light most favorable to the non-moving party, Howerton. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003).

[2] The parties refer to Alpine by several different names in the record, including Alpine Animal Hospital, Alpine Animal Clinic, and Alpine Veterinary Clinic.

[3] Neither party addresses this, but there are two different asset security agreements in the record. Howerton attached two different asset security agreements to the third-party complaint. At the same time, Howerton's

securing the notes included goodwill, all intangible assets, "documents, accounts, money, chattel paper and general intangibles." The contract terms provided Mac Kenzie could not relocate the practice or remove collateral without Howerton's consent until the notes were paid in full. Under the contracts, Howerton could take over or sell Alpine if Mac Kenzie defaulted.

¶4        Sometime in 2019, Mac Kenzie asked Mrs. Page, as his office manager, to help him find a new location for Alpine. Mac Kenzie signed a lease on the new location on March 5, 2020. On March 23, 2020, Alpine's Facebook account announced the anticipated move.

¶5        Soon after, Mac Kenzie and Mrs. Page asked Howerton about moving the practice and extending the notes. The parties failed to renegotiate the notes or lease terms, and Howerton denied permission to relocate the practice. Mac Kenzie was behind on lease payments at this time. As a result of Mac Kenzie's breach, Howerton secured the Alpine office on the last day of the lease—April 30, 2020.

¶6        Several weeks before the lease was set to expire, while Alpine was still operating, Mrs. Page applied for a Paycheck Protection Program ("PPP")[4] loan. The loan application requested $74,000 for "Payroll; Lease/Mortgage Interest."

¶7        On April 30, 2020, Mrs. Page created a GoFundMe[5] account. The fundraising campaign asked for $22,218 to "fulfill the obligations of our lease" and stated that any excess funds would help with the loans "so that

---

statement of facts in response to the summary judgment motion included only the April 7, 2015 security agreement. Appellees' statement of facts included the April 28, 2015 security agreement. For purposes of the appeal, this is not a material difference because both versions include accounts and all intangibles as collateral.

[4] The PPP was a loan program backed by the U.S. Small Business Administration to help businesses keep workers employed during the COVID-19 pandemic. *See* [Paycheck Protection Program | U.S. Small Business Administration (sba.gov)](https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program).

[5] GoFundMe is an internet crowdfunding platform. *See* [How GoFundMe Works](https://www.gofundme.com/c/how-it-works).

Alpine Animal Clinic can remain in business at the new location – which we were scheduled to move into this coming weekend."

¶8        During the first week of May, several Alpine employees, including Mac Kenzie and the Pages met, at which time the Pages agreed to form Midtown.  They hired Mac Kenzie as the managing veterinarian. In all, six of Alpine's nine employees went to work for Midtown.  Midtown filed articles of organization on May 7, 2020, and opened for business on June 1, 2020.

¶9        On May 13, 2020, Mac Kenzie filed a complaint against Howerton for wrongful eviction, alleging she violated the Governor's Executive Order 2020-21, which prohibited certain commercial evictions during the pandemic.  In response, Howerton asserted counterclaims against Mac Kenzie individually[6] and brought a third-party complaint against the Pages, Midtown, and Mac Kenzie's PLLC.  The third-party complaint alleged claims for (1) intentional interference with contract, (2) intentional interference with business expectancies, (3) conversion, (4) fraudulent transfer, (5) successor liability, (6) defamation, (7) constructive trust, and (8) declaratory judgment.

¶10        Appellees moved for summary judgment on all claims in the third-party complaint.  After oral argument, the court granted summary judgment on six claims, leaving the defamation and fraudulent transfer claims for trial.  After entry of an appealable judgment under Arizona Rule of Civil Procedure 54(b), Howerton filed a timely notice of appeal.  We have jurisdiction under Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1).

**DISCUSSION**

¶11        We review the grant of summary judgment de novo. *Andrews*, 205 Ariz. at 240, ¶ 12.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(a); *accord Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990).

---

[6] In a ruling separate from this appeal, the superior court granted partial summary judgment against Mac Kenzie on count one of the counterclaim and third-party complaint after he failed to respond.

*I.    Intentional Interference with Contractual Relations or Business Expectancies*

¶12    The tort of intentional interference with contractual relations or business expectancies imposes liability on a party "who intentionally and improperly interferes with the plaintiff's rights under a contract with another [and thereby] causes the plaintiff to lose a right under the contract." *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 33 (1986) (citations omitted). A plaintiff must show (1) the existence of a valid contractual relationship or business expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional interference inducing or causing a breach, (4) resulting damage to the party whose relationship has been disrupted, and (5) improper acts by the defendant. *Id.* (citations omitted).

¶13    Appellees do not dispute the existence of a valid contractual relationship or business expectancy between Howerton and Mac Kenzie. They do, however, challenge the remaining elements on appeal.

  *A.    Knowledge of the Contract or Business Expectancy*

¶14    According to the Pages, they had only a "cursory knowledge" of the contracts between Howerton and Mac Kenzie. However, at oral argument in superior court, Appellees' attorney conceded for purposes of summary judgment that they were aware of the contractual relationship. Appellees are bound by that concession and cannot now dispute this fact on appeal. *See Rutledge v. Ariz. Bd. of Regents*, 147 Ariz. 534, 549 (App. 1985) (holding that parties are bound by their attorneys' stipulations in a judicial proceeding unless relieved of them by the court).

¶15    In any event, there is a question of fact as to the extent of Mrs. Page's knowledge: Mrs. Page contends she acted as Alpine's office manager and, therefore, had only a cursory knowledge of the contracts. According to Howerton, however, she and Mrs. Page communicated multiple times about the lease and refinancing the note between March and May 2020. Howerton contends their emails show Mrs. Page knew Mac Kenzie was behind in payments and the amounts owed. In these emails, they also discussed Howerton's refusal to approve the relocation. Mrs. Page applied for the PPP loan and set up the GoFundMe account, so she knew these funds were intended to pay Mac Kenzie's debts. Given this evidence, the level of Mrs. Page's familiarity with contracts is a disputed material fact.

> **B.**     *Intentional Conduct Causing or Inducing a Breach of Contract or Business Expectancy*

**¶16**      Howerton argues that Appellees interfered with her contract and business expectancy with Mac Kenzie and Alpine in two ways.  First, she alleges Appellees diverted funds from the PPP loan and GoFundMe account.  Second, she claims Appellees interfered with her contractual right to take over Alpine after Mac Kenzie's default by appropriating Alpine's goodwill, digital presence, and phone number for Midtown.

> **1.**     *PPP and GoFundMe Funds*

**¶17**      The PPP funds were deposited into Alpine's bank account on May 7, 2020.  As a secured creditor, Howerton had an interest in Alpine's accounts.  Howerton argues that by using Alpine's PPP funds to operate Midtown or pay Mac Kenzie's personal expenses, Appellees interfered with her contractual right to recover her collateral.[7]  Howerton also arguably had an interest in the GoFundMe proceeds raised to pay down the lease and note.   Viewing the facts in the light most favorable to Howerton, a reasonable inference is that Appellees' actions interfered with the intended use of these funds and Howerton's interest in them as collateral under the security agreement.  It is this conduct, not Mac Kenzie's earlier breach of the lease and promissory notes, that forms the basis of the intentional interference with contractual relations and business expectancy claims.

**¶18**      As to the use of the funds, Mac Kenzie testified that Alpine continued to pay employees after April 30 because he had not decided whether to close Alpine for good.  In fact, through June 12, 2020, Alpine continued to pay employees.  But Mrs. Page formed Midtown on May 7, 2020, and several former Alpine employees went to work for Midtown.  Given the timing of these payments, it is reasonable to infer that the Pages used Alpine's PPP funds to pay Midtown employees.  Thus, a question of fact exists whether Mrs. Page used Howerton's collateral (the funds in Alpine's account) to pay Midtown employees.

**¶19**      Additionally, a significant portion of the PPP funds went to Alpine and Mac Kenzie's attorney.  This was not one of the stated purposes on the PPP loan application, and Mrs. Page appears to have written those checks.  By directing Alpine's funds to something other than Alpine's

---

[7] The PPP application was not applied for under Alpine's name but under "Donald S[.] MacKenzie DVM PLLC."

payroll, lease, or mortgage interest, Appellees arguably interfered with Howerton's interest in the collateral.

¶20   Mrs. Page created the GoFundMe account specifically to raise money to "fulfill the obligations of our lease." She claimed the funds raised would cover two months' rent, late fees, and unpaid property taxes. The initial GoFundMe page also stated that loans owed to Howerton were "in jeopardy" and any excess funds raised would "go directly to helping us handle those loans, so that Alpine Animal Clinic can remain in business at the new location." They raised $22,218 in several hours. A few days later, Mrs. Page updated the site, clarifying that the loan payments were current and any excess funds would be reserved for payroll and legal fees. The total amount raised was $32,393.[8]

¶21   Mrs. Page deposited the GoFundMe proceeds into her personal bank account and then transferred $30,000 to Midtown's newly-opened bank account. Howerton contends that Appellees paid Midtown's operating expenses from these funds. Appellees deny this and claim the GoFundMe proceeds went almost exclusively to pay Mac Kenzie's legal fees.[9] Regardless how the GoFundMe proceeds were spent, they were in the Midtown bank account, which supports the inference that Appellees, not Mac Kenzie, controlled these funds. Mac Kenzie himself was inconsistent on this point. Thus, there is a factual dispute on this issue.

*2.  Goodwill and Digital Media Accounts*

¶22   The contract allowed Howerton to take over the practice in the event of a default. Howerton argues that Appellees misled Alpine clients by implying that Alpine would continue at the new location, when it was actually Midtown. According to Howerton, this interfered with her contractual right to take over the Alpine practice upon Mac Kenzie's breach.

¶23   Howerton contends that Appellees relied on Alpine's goodwill and digital media accounts—such as Yelp, Facebook, and Google—to market and promote Midtown. She also notes that calls to Alpine were forwarded to Midtown, whose employees managed calls from

---

[8] The net amount was $31,381.47 after fees.

[9] Bank records show that after Mrs. Page deposited the GoFundMe proceeds into Midtown's account, she used the account to pay various expenses. Although some expenses may have included Mac Kenzie's attorneys' fees, many appear to be regular business expenses.

Alpine clients. On March 23, 2020, Alpine's Facebook page announced that Alpine was moving in May, and Mrs. Page also emailed notice of the move to Alpine clients. Alpine's digital accounts merged with Midtown's digital accounts, and reviews of Mac Kenzie from his time at Alpine appeared on Midtown's accounts.

¶24 Appellees do not dispute that Alpine's Facebook and Yelp accounts were "inadvertently" changed to provide Midtown's information, but claim it was only for a short time and did not confuse any clients. Whether it was inadvertent, quickly corrected, or confused clients are disputed facts. And although customer reviews of Mac Kenzie are personal to him, Midtown's digital accounts included several reviews of Alpine Animal Clinic, not just Mac Kenzie personally. Although Mac Kenzie was free to practice at another clinic, a jury could reasonably conclude that Appellees' actions intentionally capitalized on Alpine's goodwill and digital accounts to divert Alpine clients to Midtown, thereby interfering with Howerton's contractual right to take over the Alpine practice.

### 3.    Agency Defense

¶25 The Pages argue that because they acted as Mac Kenzie's agents, they could not have interfered with his contracts or business expectancies. *See Barrow v. Ariz. Bd. of Regents*, 158 Ariz. 71, 78 (App. 1988) (holding that employees acting for their company cannot interfere with the company's contract); *see also Lindsey v. Dempsey*, 153 Ariz. 230, 233 (App. 1987) (same). However, the parties dispute when the Pages stopped acting as Mac Kenzie's employees and began acting as Midtown's owners.

¶26 Many of the alleged acts occurred between the date Alpine closed and the date the Pages started Midtown. Although the Pages claim they acted as Mac Kenzie's employees, they admit their employment ended on April 30, 2020. The Pages incorporated Midtown on May 7, 2020, and opened for business on June 1, 2020. As of May 7, 2020, the Pages owned and operated Midtown, and Mac Kenzie was their employee.

¶27 It is unclear whether or for how long Mrs. Page acted as Mac Kenzie's agent after Alpine closed on April 30, 2020. Some evidence indicates Mac Kenzie directed using the PPP funds to continue paying Alpine employees. For example, Mrs. Page continued writing checks on the Alpine account until September 9, 2020. But if Alpine closed and the Pages no longer worked for Alpine as of April 30, then it is also reasonable to infer that the Pages acted in concert with Mac Kenzie after they formed Midtown and were not acting as his agents when they used the PPP funds

to pay Midtown employees who no longer worked for Alpine. Furthermore, the GoFundMe proceeds were always in Midtown's account, and Mac Kenzie was only a Midtown employee, so the Pages' use of those funds could not have been as his agent. Therefore, whether the Pages acted as Mac Kenzie's agents is a disputed fact question.

### C.    Wrongful and Improper Conduct

**¶28**        Howerton must also show that Appellees' interference was improper. *See Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs., Inc.*, 216 Ariz. 185, 187-88, ¶ 8 (App. 2007) (citations omitted). To determine whether conduct is improper, courts consider seven factors: (1) "the nature of the actor's conduct," (2) "the actor's motive," (3) "the interests of the other with which the actor's conduct interferes," (4) "the interests sought to be advanced by the actor," (5) the social interests in protecting the actor's freedom to act and the other's contractual interests, (6) "the proximity or remoteness of the actor's conduct to the interference," and (7) "the relations between the parties." *Id.* at 188, ¶ 8 (quoting *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 387 (1985), *superseded by statute on other grounds*). Usually, determining the propriety of an actor's motive is a question of fact, unless "there is no reasonable inference to the contrary in the record." *Id.* at ¶ 9 (citing *Woerth v. City of Flagstaff*, 167 Ariz. 412, 419 (App. 1990)).

**¶29**        Appellees argue that Howerton provided no evidence to dispute their claim that their motive in opening Midtown was to earn a living after Alpine closed. Although it is not improper for a competitor to advance their own economic interest, *see Miller v. Hehlen*, 209 Ariz. 462, 471, ¶ 32 (App. 2005) (citing *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 485 (App. 1988); Restatement (Second) of Torts ("Restatement") § 768 (1979)), Appellees miss the mark. The conduct at issue was not opening a competing practice. Rather, it was Appellees' use of Alpine's PPP funds, GoFundMe proceeds, digital accounts, and goodwill to further their practice. Thus, there is a question of fact as to the Pages' motives in using these assets.

**¶30**        It is also reasonable to question Appellees' motives because the superior court found questions of fact existed on the fraudulent transfer claim. This finding shows at least a debatable issue existed as to the nature of the Pages' conduct and their motive. *See* Restatement § 767 cmt. c (1979) (explaining that fraudulent or defamatory representations *may* show that the actor's interference is improper).

¶31 Appellees again argue they acted at all times as Mac Kenzie's agent, not on their own, and they only formed Midtown once Alpine closed and they were left unemployed. The underlying facts are not in dispute, but a reasonable jury could draw conflicting inferences about the propriety of Appellees' conduct from those facts. The court erred in granting summary judgment.

### D. Damages

¶32 Appellees contend there were no damages because they did not interfere with Howerton's contractual rights or business expectancies. But the issue of damages is still in question until the interference claims discussed above are resolved.

¶33 Because material factual disputes exist, the superior court erred by granting summary judgment on the intentional interference with contractual relations and business expectancy claims.

## II. Conversion

¶34 Howerton contends that Appellees converted the collateral securing the promissory notes, specifically the PPP funds, GoFundMe proceeds, Alpine's clients, client lists, digital accounts, and goodwill. She does not contend that Appellees converted any Alpine equipment or inventory.

¶35 "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller*, 209 Ariz. at 472, ¶ 34 (quoting Restatement § 222A(1) (1965)). If the plaintiff proves these elements, then the court considers the seriousness of the interference and whether the converting party must pay full value. *Id.* A party can only convert tangible personal property or intangible property that is merged with or identified with a document. *Id.* at ¶ 35 (citations omitted).

¶36 Appellees argue that the goodwill, clients, client lists, and digital accounts are intangible and thus cannot be converted. Conversely, Howerton argues that because these intangibles are listed as collateral in the promissory notes and security agreements, they are merged with a document and subject to a conversion claim.

¶37 Appellees argue that Howerton's claim for conversion of intangible property must fail because Arizona has not recognized such a

claim. Not so. *Miller* recognized the rule that an action for conversion lies for "intangible property that is merged in, or identified with, some document." *Id.* (quoting 18 Am. Jur. 2d *Conversion* § 7 (2004); *see also* Restatement § 242 cmt. a (1965)). But the court found the customer list in *Miller* did not constitute intangible property merged with a document for purposes of conversion because the list had no value "in the same sense as a stock certificate or an insurance policy." *Id.*

¶38         Although *Miller* did not address promissory notes specifically, the Restatement § 242, comment b, lists "promissory notes, bonds, bills of exchange, share certificates, and warehouse receipts" among the types of documents in which an intangible right may be merged for purposes of asserting a conversion claim. "These documents all share in common the fact that they are tangible documents containing intangible rights which are easily converted into tangible assets, not dissimilar to currency." *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 624 (Ill. App. Ct. 2006).

     *A.     Goodwill*

¶39         Although the goodwill security agreement lists goodwill as collateral, we have found no cases holding that intangible property such as goodwill becomes subject to conversion because it is included as collateral in a promissory note or security agreement. Goodwill is unlike other forms of intangible property rights that can merge or be identified with a document. A stock certificate or warehouse receipt represents a specific sum of money or item that can be controlled to the exclusion of the other party. Although parties can (and did here) place a monetary value on goodwill, it is, nevertheless, an intangible form of collateral unlike inventory, equipment, or money. *See* Restatement § 242 cmt. f ("It is at present the prevailing view that there can be no conversion of . . . such intangible rights as the goodwill of a business or the names of customers."); *but see Mitchell v. Mitchell*, 152 Ariz. 317, 323 (1987) (holding in a dissolution case that valuing goodwill is difficult, but courts have discretion to determine the value of goodwill based on the unique facts of each case).

¶40         Although Howerton, as a secured creditor, had a possessory interest in the collateral, the collateral must be property subject to a conversion action. Howerton's reliance on *Citicorp Homeowners, Inc. v. Western Surety Co.*, 131 Ariz. 334 (App. 1981), is misplaced. The collateral in *Citicorp* was tangible property, unlike the intangible goodwill at issue here. *Id.* at 336. Appellees cannot be liable for the conversion of any goodwill.

B.      *Digital Client Records, Social Media, and Marketing Accounts*

¶41      Howerton also listed clients, client records, and digital accounts as converted property.  Clients are not property and, therefore, cannot be converted.  To the extent Howerton asserts a conversion claim for Alpine clients, summary judgment was proper.

¶42      The client medical records were maintained in a cloud-based system.  Although digital client records are intangible, they contain the same information that would be found in physical records.  *See Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1277-78 (N.Y. 2007).  The client medical records, digital or physical, are collateral to which Howerton was entitled under the security agreement.  Regardless of the security agreement, this conversion claim is no different than if Alpine had maintained paper client records and Appellees retained exclusive control over the documents.

¶43      Howerton alleged that Appellees maintained access to the client records after Alpine closed and she could not access them.  According to Mac Kenzie, only he and Mrs. Page had access to client records after Alpine closed.  This statement supports an inference that Appellees exercised control over the client records in a manner inconsistent with Howerton's right to do so after the default.

¶44      Digital marketing and social media accounts exist on the internet and are, therefore, intangible in that sense.  The digital marketing and social media accounts and phone number belonged to Alpine, and as such they are also assets that Howerton had a right to control after the default.  *See Bearoff v. Craton*, 830 S.E.2d 362, 376 (Ga. Ct. App. 2019) (holding that a business's social media accounts constituted collateral under a security agreement subject to a conversion claim when the defendants continued to use the social media accounts for their own business); *but see Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012) (holding that under California law, user identification numbers and user resource locators of users' profile pages on a social media website were not capable of exclusive control so the consumer had no property interest in the information to support a conversion claim).  Although they lack a physical format, these are online resources that clients can use to do business with Alpine.  Unlike goodwill, Appellees could control this digital property to the exclusion of Howerton.  Whether they did so is unclear from the record.

**¶45** Appellees concede there was some overlap in the digital accounts and phone numbers for a short time. They claim this was so they could inform Alpine clients calling for appointments to call another clinic and was not done in bad faith. Appellees' "alleged good faith is immaterial." *Mezey v. Fioramonti*, 204 Ariz. 599, 608, ¶ 37 (App. 2003), *disapproved of on other grounds in Bilke v. State*, 206 Ariz. 462, 468, ¶ 28 (2003). The relevant issue is whether Appellees exercised control in a manner inconsistent with Howerton's rights in the property. *Id.* This is a disputed question of fact on this record.

### C. PPP and GoFundMe Funds

**¶46** Lastly, Appellees concede that the PPP funds and GoFundMe proceeds are tangible assets but argue that Mac Kenzie directed the disbursement of these funds, so they are not liable. "[M]oney can be the subject of a conversion action if the funds can be described, identified or segregated and there is an obligation to treat the funds in a specific manner." *Koss Corp. v. Am. Express Co.*, 233 Ariz. 74, 90, ¶ 54 (App. 2013) (citations omitted). As stated above, *see supra* ¶ 27, there are disputed factual issues on the agency defense precluding summary judgment. Thus, summary judgment on the conversion of funds was also improper.

### III. Successor Liability

**¶47** Howerton argues that Appellees are liable for Mac Kenzie's obligations under the theory of successor liability. A successor company is liable for the predecessor company's obligations when (1) the successor is a mere continuation or reincarnation of the predecessor or (2) clear and convincing evidence shows the predecessor transferred assets to the successor for the fraudulent purpose of escaping debt liability. *Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, 191, ¶ 16 (App. 2008).[10]

### A. Mere Continuation Theory

**¶48** To be liable under the mere continuation theory, "there must be 'a substantial similarity in the ownership and control of the two corporations,' and 'insufficient consideration running from the new company to the old' for the assets passing to the new company." *Warne*,

---

[10] Two other bases exist for imposing successor liability, but neither apply here. *See Warne*, 219 Ariz. at 191, ¶ 16 (stating that successor liability also exists if the successor expressly agreed to assume the predecessor's liabilities or if the alleged transactions between the two companies amounted to a consolidation or merger).

219 Ariz. at 192, ¶ 18 (citing *A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.*, 172 Ariz. 324, 330 (App. 1992)).  The basis for this liability is to prevent a company from escaping liability by merely changing its form without significantly altering the substance of the company.  *Id.* at 191-92, ¶ 18 (citation omitted).

**¶49**          Here, there is a substantive difference in ownership.  Mac Kenzie owned Alpine, and Mrs. Page owns Midtown.  Despite this change in ownership, Howerton contends there was no real change in how the practice operated.  To be sure, Mac Kenzie admitted that while Alpine operated, Mrs. Page handled the business side of the practice, and he focused on the medical aspects.  But, in most jurisdictions, the relevant inquiry "is whether there is a continuation of the *corporate entity of the seller*—not whether there is a continuation of the *seller's business operation*." *Vernon v. Schuster*, 688 N.E.2d 1172, 1176 (Ill. 1997).

**¶50**          Howerton argues the continuation of corporate identity is but one of several factors that courts consider.  In addition to the similar directors, officers, and stockholders, courts consider other similarities such as customers, products, employees, geographic area, and operations.  *See Warne*, 219 Ariz. at 192, ¶ 19 (companies had similar names, services provided, customers, and business partners); *Teeters*, 172 Ariz. at 328, 330 (companies had similar customers, products, customer contracts, and geographic area); *Bogart v. Phase II Pasta Machs., Inc.*, 817 F. Supp. 547, 549 (E.D. Penn. 1993) (companies had similar business operations and products); *Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 223-24, ¶¶ 24-25 (Vt. 2005) (companies had similar business operations, telephone numbers, and employees).  But in each case, the two companies also had the same owners, officers, or directors.  *See Warne*, 219 Ariz. at 192, ¶ 19; *Teeters*, 172 Ariz. at 330; *Bogart*, 817 F. Supp. at 549; *Gladstone*, 878 A.2d at 217, ¶ 5.

**¶51**          Although Alpine and Midtown operate in the same manner and the ownership change is unlikely to affect the clients, the change in ownership is a substantive difference with legal ramifications.  A similarity in ownership is required.  *Warne*, 219 Ariz. at 192, ¶ 18 (citing *Teeters*, 172 Ariz. at 330).  "The reason for this requirement is that corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself." *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985) (citing *Fehl v. S.W.C. Corp.*, 433 F. Supp. 939, 945 (D. Del. 1977)).  Thus, the successor liability claim cannot rely on the mere continuation theory.

B. *Fraudulent Purpose*

¶52 Successor liability also exists when "the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Teeters*, 172 Ariz. at 329 (citation omitted). According to Appellees, they did not receive any assets from Alpine, so there can be no fraudulent transfer. Although Appellees may not have received any inventory or equipment from Alpine, the PPP funds and GoFundMe proceeds are Alpine's assets. In fact, the superior court denied summary judgment on the fraudulent transfer claim based on the transfer of PPP funds. Similarly, the client records, digital accounts, and telephone numbers are Alpine property that Appellees arguably transferred to the new practice at Midtown. Although Appellees contend they had no fraudulent intent, direct proof of a fraudulent intent is not required. "A party can meet its burden of proof by showing circumstantial evidence through which fraud may reasonably be inferred." *Premier Fin. Servs. v. Citibank (Ariz.)*, 185 Ariz. 80, 85 (App. 1995) (citing *Ollason v. Glasscock*, 26 Ariz. 193, 202 (1924)).

¶53 Howerton's allegations support several "badges of fraud," i.e., facts that tend to show the existence of fraud. *See id.* at 84 n.2. The factors set forth in A.R.S. § 44-1004(B) list badges of fraud that courts may consider in deciding a fraudulent transfer claim. Because a claim for successor liability based on a fraudulent transfer is analogous, we consider the same factors in determining whether summary judgment was appropriate. *See Gibbons v. Kodiak Concepts, LLC*, 1 CA-CV 21-0211, 2022 WL 453999 at *5, ¶¶ 24-26 (Ariz. App. Feb. 15, 2022) (mem. decision) (applying factors in § 44-1004(B) to determine a successor liability claim based on a fraudulent purpose theory); *Airbus DS Optronics GmbH v. Nivisys LLC*, CV-14-02399-PHX-JAT, 2017 WL 1197105, at *10 (D. Ariz. Mar. 31, 2017) (order) (holding that "fraudulent transfer claims are governed by the same rules for a finding of fraud to impose successor liability" (citation omitted)).

¶54 The Pages were arguably insiders because Mrs. Page managed the Alpine practice, and both were Alpine employees. *See* A.R.S. § 44-1004(B)(1) ("The transfer or obligation was to an insider."). There is some evidence that Mac Kenzie also retained control of at least some property. *See* A.R.S. § 44-1004(B)(2) ("The debtor retained possession or control of the property transferred after the transfer."). According to the Pages, Mac Kenzie directed the use of all funds. Along with Mrs. Page, he also controlled client records after Midtown opened. Appellees argued this is because he is legally required to maintain client records, but this does not necessarily negate a fraudulent intent.

¶55 At the time they formed Midtown, the Pages were aware of Mac Kenzie's obligations, although they dispute the extent of that knowledge. *See* A.R.S. § 44-1004(B)(3) ("The transfer or obligation was disclosed or concealed."). Howerton also alleged that the GoFundMe proceeds transfer was concealed to the extent the funds were not used for the reasons stated in the public fundraising announcement. Again, Appellees claim they did not use the funds improperly, but direct evidence is not required. *Premier Fin. Servs.*, 185 Ariz. at 85. A contrary inference is also reasonable.

¶56 The Pages knew (1) Mac Kenzie was consulting an attorney about the dispute with Howerton and (2) Howerton had secured the premises after the default. Thus, it is reasonable to infer the Pages knew Mac Kenzie was subject to a lawsuit. *See* A.R.S. § 44-1004(B)(4) ("Before the transfer was made . . . the debtor had been sued or threatened with suit."). Howerton argued that Mac Kenzie transferred substantially all of Alpine's assets to Midtown. *See* A.R.S. § 44-1004(B)(5) ("The transfer was of substantially all of the debtor's assets."). Whether Midtown received "substantially all" of Alpine's assets is unclear from the record, but the amount of assets transferred was not de minimis.

¶57 The superior court erred in granting summary judgment on the successor liability claim based on the fraudulent transfer theory. However, the court properly granted summary judgment on the mere continuation theory.

*IV. Constructive Trust and Declaratory Judgment*

¶58 Howerton's third-party complaint sought a constructive trust on the GoFundMe proceeds and a declaration that Howerton is entitled to a constructive trust on the GoFundMe proceeds. "A court may impose a constructive trust when title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress, or similar means, or if there has been a breach of fiduciary duty." *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 409, ¶ 107 (App. 2012) (citations omitted).

¶59 Appellees argue they were entitled to summary judgment on these claims because they did not benefit from these funds or act in bad faith. Questions of fact exist about the propriety of Appellees' use of these funds. But we may affirm the superior court's ruling if it reached the right result for any reason. *See Schooley v. Pena*, 253 Ariz. 185, 188, ¶ 10 (App. 2022) (citing *Gen. Elec. Cap. Corp. v. Osterkamp*, 172 Ariz. 191, 193 (App.

1992)).  Howerton's request for a constructive trust and related declaratory judgment is limited to the GoFundMe proceeds.  Although she identified a specific fund, the money has been spent.  Thus, money damages is an appropriate remedy, and "[a] general claim for money damages will not give rise to a constructive trust."  *Burch & Cracchiolo, P.A. v. Pugliani*, 144 Ariz. 281, 286 (1985) (citing *Amtitle Tr. Co. v. Fitch*, 25 Ariz. App. 182, 184 (1975)).  Howerton is not entitled to a constructive trust.  Therefore, summary judgment on the constructive trust and declaratory judgment claims is affirmed.

*V.     Attorneys' Fees and Costs on Appeal*

**¶60**        Both parties request attorneys' fees and costs on appeal under A.R.S. § 12-341.01, which authorizes an award of fees to the prevailing party in a contract action.  Only the successor liability claim is based on a contract, and neither party was entirely successful on that claim.  The remaining claims sound in tort, not contract.  *See Bar J Bar Cattle Co.*, 158 Ariz. at 486 ("The duty not to interfere with the contract of another arises out of law, not contract.").  Nor are Appellees entitled to an award of attorneys' fees under A.R.S. § 12-349.  Each party shall pay their own fees and costs on appeal.

**CONCLUSION**

**¶61**        We vacate summary judgment on the intentional interference with contractual relations and business expectancy claims.  We affirm summary judgment on the conversion of goodwill and clients but vacate summary judgment on the remaining conversion claims.  The judgment on successor liability is vacated as to the fraudulent purpose theory, but we affirm the ruling that Howerton cannot base the successor liability claim on the mere continuation theory.  We also affirm the entry of summary judgment on the constructive trust and declaratory judgment claims.  We remand the matter to the superior court for further proceedings consistent with this decision.

