2026 IL App (3d) 240274

Opinion filed June 15, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| KERMIT S. MUHAMMAD, M.D., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellant, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-24-0274 |
| | ) | Circuit No. 21-CH-70 |
| RIVERSIDE HEALTHCARE and | ) | |
| PHILIP KAMBIC, | ) | Honorable |
| | ) | Lindsay Parkhurst, |
| Defendants-Appellees. | ) | Judge, presiding. |
| | ) | |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court, with opinion.
Justices Peterson and Bertani concurred in the judgment and opinion.
_____

**OPINION**

¶ 1        Plaintiff, Dr. Kermit S. Muhammad, appeals from the circuit court of Kankakee County's

dismissal, with prejudice, of his third amended complaint. On appeal, plaintiff challenges the

circuit court's findings, culminating in the dismissal, that defendants, Riverside Healthcare

(Riverside) and Philip Kambic, were immune from civil liability under section 10.2 of the Hospital

Licensing Act (Act) (210 ILCS 85/10.2 (West 2020)), that a portion of the controversy was moot,

and that plaintiff failed to state a claim for relief. For the following reasons, we affirm in part,

reverse in part, and remand.

## I. BACKGROUND

### A. Factual Allegations

Plaintiff alleged the following facts in his third amended complaint. Plaintiff is a registered member of the Nation of Islam and holds the "sincere religious belief that vaccinations are in direct contradiction to the Will and Commandments of God." He is also an orthopedic surgeon employed by Orthopedic Associates of Kankakee/Illinois Bone and Joint Institute, LLC, and has clinical privileges at Riverside. Plaintiff alleged that, throughout the 17 years that he has been a member of the staff at Riverside, he has conscientiously objected to and been exempted from receiving all vaccinations, on account of his religious beliefs.

#### 1. *Riverside's COVID-19 Vaccination Policy*

Relevant to this dispute, section 12.1 of Riverside's Medical Staff Bylaws (Bylaws) states that "[t]he Medical Executive Committee shall review, develop and adopt policies, which shall be binding upon the medical staff, its members, and those otherwise granted permission to practice or holding clinical privileges" and that "[o]nly policies adopted by the Medical Executive Committee are binding upon the medical staff." Section 13.2 of the Bylaws separately states that "all policies of the Medical Staff may be adopted and amended by a majority vote of the Medical Executive Committee" and that changes to "Medical Staff policies will become effective only when approved by the Board [of Directors]."

On August 26, 2021, Illinois Governor J.B. Pritzker issued an executive order that required healthcare workers to be vaccinated against COVID-19, but further provided that an individual would be exempt from the requirement if the vaccination were to require the individual to "violate or forgo a sincerely held religious belief" (August 26 executive order). (Internal quotation omitted.) The following day, Kambic, the president and chief executive officer of Riverside,

2

circulated a memorandum stating that all staff would need to be vaccinated against COVID-19 by October 31, 2021 (August 27 memorandum). The August 27 memorandum explained that Riverside was imposing the vaccination requirement because of the August 26 executive order, the fact that the Food and Drug Administration had fully approved the Pfizer COVID-19 vaccine, the "resurgence of infections," and Riverside's "commitment to provide the highest quality patient care in the safest environment for [its] staff."

¶ 8 Also in August 2021, Riverside issued a policy, effective August 27, 2021, that required its medical staff to receive the COVID-19 vaccination by October 31, 2021, unless exempt because of "[r]eligious [c]onviction" (vaccination policy). The vaccination policy further required any staff member who declined to receive the vaccination on account of "sincerely held religious beliefs" to submit a request for a religious exemption and to wear an N95 mask throughout his or her shift. Additionally, the vaccination policy stated that "[e]ven in circumstances where a religious belief may otherwise qualify for an exemption, Riverside reserve[d] the right to deny the request where safety risks and legal liability created an undue hardship and increased risk for transmission of the Covid virus among patients, staff and community members."

¶ 9 Plaintiff alleged that, during a September 9, 2021, speech, former President Joe Biden had "announced a COVID-19 plan that would include an Emergency Temporary Standard *** from the federal Occupational Safety and Health Administration *** related to vaccine requirements." In a subsequent memorandum, dated September 10, 2021, Riverside stated that, until it received and could review the contents of the Emergency Temporary Standard that former President Biden had referenced in his September 9, 2021, speech, it would "be temporarily suspending the decisions on pending religious *** exemption requests." On September 12, 2021, plaintiff submitted a religious exemption request, pursuant to the vaccination policy.

3

¶ 10 Five days after plaintiff submitted his religious exemption request, Kambic circulated a memorandum stating that the vaccination policy was to remain in effect, with "[o]ne important modification," which was that, "[w]here a religious belief [might have] otherwise qualified for an exemption, Riverside [would] deny such request for all patient-facing positions where safety risks and legal liability create[d] an undue hardship and increase[d] risk for transmission of the COVID-19 virus among [the] patients and staff" (September 17 memorandum). In October 2021, the Board of Directors (Board) approved the vaccination policy as issued in August 2021.

¶ 11 On October 8, 2021, Riverside posted a video on YouTube that featured Kambic and was directed at Riverside employees " 'to answer questions,' and 'to explain the why of why [Riverside was] doing some things' " (YouTube video). Plaintiff alleged that, in the YouTube video, Kambic had stated that, "for employees to choose to refuse to be vaccinated [was] to say, 'I'm going to have to leave' Riverside."

¶ 12 2. *Notification of Adverse Action*

¶ 13 In an October 27, 2021, letter authored by Kambic, Riverside notified plaintiff that the Medical Executive Committee (Executive Committee) had recommended to the Board that the clinical privileges of medical staff who had not yet complied with the vaccination policy be terminated (October 27 letter). The letter stated that, because the loss of clinical privileges constituted an adverse action under the Bylaws, plaintiff was allowed to request a hearing, the scope of which would be limited to his compliance with the vaccination policy. The letter further stated that if plaintiff did not request a hearing, then his membership on the medical staff would be terminated effective 11:59 p.m. on November 30, 2021. Attached to the letter was a copy of the vaccination policy.

4

¶ 14                                    3. *Hearing on Adverse Action*

¶ 15        Section 11.3-1 of the Bylaws provides that a "hearing is a forum for the resolution of issues involving professional conduct and competence on an intraprofessional basis." Section 11.3-3 of the Bylaws also mandates that, in the event of a hearing, the president of the medical staff and chief executive officer must appoint a hearing committee that is comprised of at least three medical staff members "with no prior involvement in the matter" and that "[t]he affected [p]hysician has the right to inspect pertinent information with regard to the basis on which adverse decision was made." Under sections 11.3-6 and 11.3-7 of the Bylaws, after a hearing concludes, the hearing committee must issue a written report that contains its findings and recommendations to the Board as to whether to accept, reject, or modify the prior corrective action recommendation, and the Board must later issue a final written decision.

¶ 16        On November 23, 2021, pursuant to the Bylaws, plaintiff requested a hearing regarding the denial of his religious exemption request and the potential termination of his clinical privileges. Plaintiff also requested "the right to inspect any and all pertinent information with regard to the basis on which the adverse decision was made at an agreeable time reasonably in advance of the hearing."

¶ 17        The hearing requested by plaintiff ultimately commenced on January 18, 2022. The hearing committee comprised Dr. Jason Serpe, Dr. Scott Smithgall, and Dr. Ryan Meiners. Also present at the hearing were Kambic; counsel for plaintiff, attorney Troy Lundquist; and counsel for Riverside and advisor to the hearing committee, attorney Michael Phillips. At the outset of the proceedings, the hearing committee clarified, in response to a request by Lundquist, that the "operative policy" with which plaintiff was said not to have complied was the vaccination policy, as issued in August

2021 and approved by the Board in October 2021. Later during the hearing, the following exchange took place:

"[PLAINTIFF]: *** So the policy that we have here, which is the policy that, you know, I based [my application for a religious exemption] on, it doesn't say anything about denying exemption for front-facing activities with patients.

And so my question is, you know, why is that different? Is there a different policy, or why is that?

* * *

[PLAINTIFF]: I mean, the policy here, so this policy, which was approved in October, it allows for religious exemptions. But apparently, there's some additional policy someplace which says that you can't have a religious exemption because all of them were denied.

So I'm saying, where is that policy? Yeah, it's not in here.

[MR. KAMBIC]: That policy doesn't exist and that's not the point of the hearing. But the policy doesn't exist. We never said that we were going to deny every religious exemption.

[PLAINTIFF]: Okay. Well, specifically in that case, why was mine denied?

[MR. PHILLIPS]: Because you're patient-facing, and you will endanger ***.""

¶ 18 Also during the hearing, Lundquist asked for plaintiff to be provided with any "medical evidence, articles, guidelines, [and] things of that nature" that were relied upon in the decision to take adverse action against plaintiff. Kambic stated that Lundquist's request would be taken "under advisement." Later during the hearing, plaintiff asked whether there was "any specific medical

6

literature" that was relied upon in the development of the vaccination policy, to which Phillips responded: "I think that's something your attorney asked, and we're taking that under advisement."

¶ 19   Following the hearing, the hearing committee issued a report in which it found that plaintiff was "sincere in his religious convictions," but that the COVID-19 pandemic had "created a situation that supersede[d] individual preference" (report). The hearing committee further found that Riverside's "decision to institute a vaccination mandate was made for the safety and protection of patients and the staff who cared for them" and that plaintiff had not been discriminated against, "given the provisions of the [vaccination policy] were uniformly applied to all medical staff providers seeking religious exemptions." The hearing committee thus recommended that the Board uphold the Executive Committee's recommendation to terminate plaintiff's medical staff membership and clinical privileges, which the Board subsequently did.

¶ 20   In a letter dated February 18, 2022, Riverside informed plaintiff that, in response to his request at the January 18, 2022, hearing for the " 'specific medical literature' " that Riverside had relied upon to develop the vaccination policy, said policy was "not based upon a specific piece of medical literature but rather the medical judgment of Dr. Moss and selected members of Riverside's medical staff." Riverside also stated, however, that reports published by the Centers for Disease Control and Prevention (CDC) regarding the efficacy of COVID-19 vaccination had informed the medical knowledge and judgment of Riverside's staff and that those reports were available to the public through the CDC's Morbidity and Mortality Weekly Report.

¶ 21             B. Procedural History

¶ 22   On November 23, 2021, plaintiff filed a complaint against defendants in the circuit court of Kankakee County that alleged, in sum, that the vaccination policy violated the Health Care Right of Conscience Act (745 ILCS 70/1 *et seq.* (West 2020)) and that Riverside had violated the

7

Bylaws by denying his religious exemption request. On that same day, plaintiff also filed an emergency motion for a temporary restraining order and preliminary injunction that would, in part, prohibit defendants from "terminating, transferring, suspending, placing on paid or unpaid leave, revoking or suspending any medical staff privileges or hospital credentials, or otherwise retaliat[ing] against [plaintiff]" for filing a religious exemption request.

¶ 23    On March 29, 2022, the circuit court granted plaintiff a temporary restraining order that enjoined defendants from taking any adverse action against plaintiff's clinical privileges based on his COVID-19 vaccination status. The temporary restraining order remained in effect until August 26, 2022, around which time Riverside amended the vaccination policy to allow religious exemptions for patient-facing staff in light of the decline in COVID-19 infections and mortality rates in the local community and nationwide. Plaintiff alleged that the temporary restraining order prevented Riverside from "officially" terminating his clinical privileges.

¶ 24    On May 30, 2023, plaintiff filed his third amended complaint, which contained four counts. Starting with count I, for breach of contract, plaintiff alleged that Riverside had violated the Bylaws and the Act by taking adverse action against his clinical privileges for a "sham purpose," rather than to promote the quality of patient care. Plaintiff also alleged that all physicians must participate in a managed care, government, or private insurance program (collectively, "insurance programs") to practice and that the insurance programs "re-credential" participating physicians every two years. According to plaintiff, Riverside must disclose its adverse action against his clinical privileges as part of the re-credentialing process, and the insurance programs are unlikely to re-credential and are likely to increase rates and government scrutiny in light of the adverse action. Plaintiff alleged that, because of Riverside's adverse action against his clinical privileges,

8

he must now pay increased rates for the rest of his career, and his ability to practice medicine has been "significantly curtailed."

¶ 25 As to count II, for tortious interference with existing and prospective business relations, plaintiff alleged that defendants knew that he had both existing and prospective relations with patients whom he was currently treating and who would return to him for ongoing cases, as well as with physicians unaffiliated with Riverside who would refer cases to him. Plaintiff further alleged that Riverside had directed his patients to a physician employed by Riverside Medical Group, an affiliate of Riverside, and had instructed the unaffiliated physicians to refer patients to this same physician employed by Riverside Medical Group rather than to plaintiff. Plaintiff alleged that defendants' actions had been motivated by his "unvaccinated status" and had caused him to lose a substantial portion of his medical practice.

¶ 26 Under count IV,[1] for intentional interference with employment contract, plaintiff alleged that Kambic had induced Riverside to breach the provisions of the Bylaws through conduct that included authoring, distributing, and enforcing the policy of denying religious exemptions to staff in patient-facing positions; refusing to provide plaintiff with the literature upon which he relied in determining that plaintiff was a danger to patients or staff; and posting YouTube videos in which he stated that "all staff in patient-facing positions would be terminated." Plaintiff alleged that, in so inducing Riverside, Kambic had acted with self-interest, a desire to harm plaintiff, and a desire to promote religious discrimination at Riverside.

¶ 27 In count V, for intentional infliction of emotional distress, plaintiff alleged that Kambic and other Riverside representatives had engaged in a pattern of discriminatory and harassing conduct to retaliate against him for requesting an exemption to the vaccination policy. According to

[1]The third amended complaint does not contain a count "III."

9

plaintiff, this conduct was extreme and outrageous and included "knowingly and intentionally" violating the Bylaws during the course of revoking his clinical privileges; preventing him from presenting a full defense during the January 18, 2022, hearing; disregarding the evidence presented during the hearing; subjecting his work performance to stricter scrutiny compared to the work performance of other similarly situated unvaccinated staff with medical exemptions; subjecting him to demeaning and humiliating comments and behavior regarding his religious beliefs and unvaccinated status; subjecting him to "repeated baseless" peer review processes so as to interfere with his ability to practice; and influencing the peer review process to lead to the termination of his clinical privileges. Plaintiff alleged that, because of defendants' conduct, he suffered severe emotional distress that resulted in guilt, shame, embarrassment, hopelessness, anguish, fury, humiliation, loss of sleep, decrease in appetite, and "other physical manifestations of emotional distress."

¶ 28    On July 5, 2023, defendants filed a combined motion to dismiss the third amended complaint under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)). In their motion, defendants requested that the circuit court dismiss all four counts of the complaint, pursuant to section 2-619 of the Code (*id.* § 2-619), because they were immune from liability under section 10.2 of the Act (210 ILCS 85/10.2 (West 2020)). Defendants also requested that, in the alternative, the court dismiss count I of the third amended complaint, pursuant to section 2-619, because it became moot after Riverside amended its vaccination policy, and that the court dismiss counts II, IV, and V of the third amended complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2020)) for failure to state a claim for relief.

¶ 29    Following a hearing on defendants' combined motion to dismiss, the court found that defendants were immune from liability under section 10.2 of the Act, that count I was moot, and

10

that plaintiff had failed to state a claim for relief under counts II, IV, and V, respectively. Based on these findings, the court dismissed the entirety of the third amended complaint with prejudice.

¶ 30                                    II. ANALYSIS

¶ 31        On appeal, plaintiff challenges the circuit court's grant of defendants' combined motion to dismiss his third amended complaint, on multiple grounds. First, plaintiff argues that defendants were not immune from liability under section 10.2 of the Act because he had sufficiently alleged that they took adverse action against his clinical privileges for a sham purpose, which the Act does not protect. Second, plaintiff argues that count I of the third amended complaint was not moot because he had sufficiently alleged that he had incurred damages as a result of defendants' adverse action against his clinical privileges, despite the fact that defendants later amended the vaccination policy. Third, plaintiff argues that he stated a claim for relief under counts II, IV, and V of the third amended complaint, respectively.

¶ 32                                  A. Legal Standards

¶ 33        Section 2-619.1 of the Code permits a litigant to file a combined motion to dismiss pursuant to sections 2-615 and 2-619 of the Code. See 735 ILCS 5/2-619.1 (West 2020). "A section 2-615 motion admits all well-pleaded facts and attacks the legal sufficiency of [a] complaint." *Floyd v. Rockford Park District*, 355 Ill. App. 3d 695, 699-700 (2005). The question raised by a section 2-615 motion is whether the allegations in the complaint, construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Id.*; *Doe v. Chicago Board of Education*, 339 Ill. App. 3d 848, 853 (2003). Dismissal pursuant to section 2-615 is proper when it is apparent that no set of facts can be proven that would entitle the plaintiff to relief. *Ozuk v. River Grove Board of Education*, 281 Ill. App. 3d 239, 244 (1996).

11

¶ 34    In contrast, a section 2-619 motion admits the legal sufficiency of a complaint and all well-pleaded facts and reasonable inferences therefrom but raises an affirmative matter outside of the complaint that bars or defeats the cause of action. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 31. As to any affirmative matter raised in a section 2-619 motion, there is no admission of truth or sufficiency. *Buckner v. O'Brien*, 287 Ill. App. 3d 173, 178 (1997). Statutory immunity is an affirmative matter properly raised in a section 2-619 motion. *Wilson v. City of Decatur*, 389 Ill. App. 3d 555, 558 (2009).

¶ 35    When considering a section 2-615 or 2-619 motion to dismiss, a court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from these facts in favor of the nonmoving party. *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003). We apply *de novo* review to dismissals made pursuant to either section 2-615 or 2-619 of the Code. *Id.* Furthermore, we may affirm the circuit court's dismissal of a complaint on any basis in the record, regardless of the court's reasoning. *Kucinsky v. Pfister*, 2020 IL App (3d) 170719, ¶ 34.

¶ 36                              B. Section 2-619 Dismissal

¶ 37                                  1. *Mootness*

¶ 38    We start by analyzing whether count I of the third amended complaint in this case is moot. It is well settled that the subject matter jurisdiction of the appellate court extends only to cases that present an actual controversy. See, *e.g.*, *Lo v. Provena Covenant Medical Center*, 356 Ill. App. 3d 538, 540 (2005). Accordingly, this court will not consider moot or abstract questions or render an advisory decision. *Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 540 (2005). "An issue is moot if no actual controversy exists or events happen that make it impossible for the court

12

to grant effectual relief." *Baker v. Forest Preserve District of Cook County*, 2015 IL App (1st) 141157, ¶ 35.

¶ 39    Plaintiff in this case cites *Gates v. Holy Cross Hospital*, 175 Ill. App. 3d 439 (1988), to support his argument that count I is not moot. The plaintiff in *Gates* was a surgeon whose clinical privileges at a hospital were summarily suspended. *Id.* at 441. The plaintiff later sued the hospital, along with three other defendants, and alleged in his complaint that the hospital had violated numerous procedural requirements that its medical staff bylaws set forth regarding the suspension of clinical privileges. *Id.* at 441, 443. In his complaint, the plaintiff sought the removal of the summary suspension from his record and compensation for damages in the amount of $250,000. *Id.* at 444.

¶ 40    On appeal following the dismissal of the complaint with prejudice, the defendants argued that the issue was moot because the plaintiff's suspension had been terminated and his full clinical privileges had been restored prior to the filing of his complaint. *Id.* at 448. The appellate court noted, however, that there remained a question of whether the hospital had substantially complied with its medical staff bylaws relative to the summary suspension of the plaintiff's clinical privileges. *Id.* The court further noted that, if the plaintiff were to prevail on the merits of the case, then he would be entitled to an expungement of the summary suspension from his record. *Id.* The court thus concluded that an actual controversy still existed and that the issue was not moot, despite the fact that the plaintiff's clinical privileges had since been restored. *Id.*

¶ 41    As was similarly so in *Gates*, plaintiff in this case alleged that a temporary restraining order prevented Riverside from "officially" terminating his clinical privileges and that, after it had taken adverse action against his clinical privileges, Riverside amended the vaccination policy to allow religious exemptions to patient-facing staff. Also like the plaintiff in *Gates*, plaintiff in this case

13

nevertheless alleged under count I of the third amended complaint that defendants violated Illinois law and the Bylaws in taking adverse action against his clinical privileges. Furthermore, although plaintiff did not specifically request the removal of the adverse action from his record in his prayer for relief, he did seek monetary relief to compensate for damages that he alleged had resulted from the fact that Riverside was obligated to report the adverse action to insurance programs in which he was required to participate, in turn causing him to have to pay increased rates "for the remainder of his career" and his ability to practice medicine to be "significantly curtailed."

¶ 42    Despite the similarities to the facts in *Gates*, defendants in this case argue that count I of the third amended complaint is moot because they are immune from liability for the monetary damages sought by plaintiff, under section 10.2 of the Act. Although defendants contend that they are so immune, plaintiff contends the opposite, and it remains incumbent on this court to determine which of these contentions is correct and whether defendants are in fact immune under section 10.2 of the Act. Furthermore, if we were to determine that defendants are not so immune, then there would remain a question of whether defendants violated Illinois law and the Bylaws in taking adverse action against plaintiff's clinical privileges, which, if answered in the affirmative, would in turn potentially entitle plaintiff to the monetary relief that he seeks. Accordingly, we find that there is an actual controversy under count I of the third amended complaint and that the count is not moot. See *U-Haul Co. of Chicago Metroplex v. Town of Cicero*, 87 Ill. App. 3d 915, 918-19 (1980) (concluding that a count of a complaint was not moot but nevertheless properly dismissed, after finding that the defendants were statutorily immune from liability for damages alleged under that count of the complaint).

14

¶ 43                                      2. *Immunity*

¶ 44          Next, we analyze whether defendants are immune from liability for the monetary damages

that plaintiff alleged under all four counts of his third amended complaint. Relevant to our analysis,

section 10.2 of the Act provides the following, in relevant part:

> "[N]o hospital and no individual who is a member, agent, or employee of a hospital,
> hospital medical staff, hospital administrative staff, or hospital governing board shall be
> liable for civil damages as a result of the acts, omissions, decisions, or any other conduct,
> except those involving willful or wanton misconduct, of a medical utilization committee,
> medical review committee, patient care audit committee, medical care evaluation
> committee, quality review committee, credential committee, peer review committee, or any
> other committee or individual whose purpose, directly or indirectly, is internal quality
> control or medical study to reduce morbidity or mortality, or for improving patient care
> within a hospital, or the improving or benefiting of patient care and treatment, whether
> within a hospital or not, or for the purpose of professional discipline including institution
> of a summary suspension in accordance with Section 10.4 of this Act and the medical staff
> bylaws." 210 ILCS 85/10.2 (West 2020).

Illinois courts have interpreted section 10.2 to grant physicians, hospitals, and their staff immunity

from civil damages for actions taken in the course of serving on a hospital peer review committee

or other credential committee. See, *e.g.*, *Cardwell v. Rockford Memorial Hospital Ass'n*, 183 Ill.

App. 3d 1072, 1077-78 (1989) (collecting cases). The supreme court has further interpreted this

section to "indicate a general legislative intention that hospitals and medical staffs be free to

exercise their professional judgment in the selection and retention of medical staff members."

*Barrows v. Northwestern Memorial Hospital*, 123 Ill. 2d 49, 58 (1988).

15

¶ 45        The parties in this case do not seem to dispute that Riverside is a "hospital," that Kambic is an "employee of a hospital" under section 10.2, or that, consequently, defendants are of the types of individuals whom the section protects. However, the parties do dispute the actual purpose of defendants' alleged conduct and whether, in light of that purpose, immunity under section 10.2 applies. Specifically, defendants assert that immunity applies because the purpose of their alleged conduct was to protect patient and staff safety during the COVID-19 pandemic. To the contrary, plaintiff asserts that immunity does not apply because the purpose of defendants' alleged conduct was not any of the grounds set forth under section 10.2 but was, instead, a "sham" and undertaken "to continue to usurp [his] call volume and preferrable cases at [Riverside]," to discriminate against him based on his religious beliefs, and "to retaliate against [him] for challenging [Kambic's] unadopted Covid policy and based on [Kambic's] personal animus for [him]."

¶ 46        Illinois reviewing courts have discussed the concept of a sham purpose for actions taken during a peer review process only once, in the decision of *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220. The plaintiff in *Valfer* was a physician who sued a hospital for breach of contract to recover civil damages that had allegedly stemmed from the hospital's decision not to reappoint him. *Id.* ¶¶ 3, 12. The hospital filed a motion for summary judgment on the plaintiff's breach of contract claim, arguing, in part, that it was immune from liability for civil damages under section 10.2. *Id.* ¶ 13. The circuit court ultimately awarded summary judgment in favor of the hospital after determining that the plaintiff had provided insufficient evidence to support his allegation that the reasons for the hospital's decision to discharge him were that one doctor had an economic conflict with him and another doctor morally objected to his practice. *Id.* ¶¶ 13-14.

¶ 47        On appeal, the supreme court in *Valfer* emphasized that section 10.2 confers immunity in the context of quality review "*only if* the review was undertaken based on the actual purpose

16

specified by the statute—*i.e.*, to maintain or improve the quality of health care." (Emphasis added.) *Id.* ¶ 34. Accordingly, the court warned that its decision "should not be interpreted as condoning sham peer review." *Id.* Furthermore, the court stated that a plaintiff physician's claim pertaining to a peer review decision may survive a motion to dismiss when the plaintiff "alleges well-pleaded facts—which are not based on mere speculation or unsupported conclusions—to indicate that the purpose of the discipline was not based on the grounds enunciated in the statute but was instead a sham." *Id.* ¶ 36. In applying these principles to the facts of the case before it, the court noted that the plaintiff's breach of contract claim had advanced beyond the pleading stages, "despite the conclusory nature of his allegations." *Id.* ¶¶ 38. The supreme court also found that the circuit court had properly awarded summary judgment in favor of the hospital. *Id.* ¶¶ 39-40.

¶ 48        The *Valfer* court considered the decision of *Levitin v. Northwestern Community Hospital*, 64 F. Supp. 3d 1107 (N.D. Ill. 2014), to be instructive on the issue of whether to affirm the circuit court's grant of summary judgment. *Valfer*, 2016 IL 119220 ¶ 39. One of the plaintiffs in *Levitin*, Yelena Levitin, was a female general surgeon whose clinical privileges at a hospital had been revoked during the period that she had practiced within the General Surgery Section of the hospital, which, in turn, oversaw the hospital's Surgical Audit Committee. *Levitin*, 64 F. Supp. 3d at 1111-12. The plaintiffs alleged that, prior to the revocation of Levitin's clinical privileges, Daniel Conway, the chairman of the Surgical Audit Committee and chief of the General Surgery Section, had "engag[ed] in heightened scrutiny of [Levitin's] surgeries" and had accessed her patients' private medical records to find reasons to challenge her professional competence and abilities. *Id.* at 1115. The plaintiffs further alleged that Conway had also provided William Soper, his partner and the chief of the hospital's Department of Surgery, a list of past surgical cases, which Soper in turn used to support a request that one of the hospital's oversight committees review Levitin's

17

activities and take corrective action against her. *Id.* at 1116. The plaintiffs asserted that Conway and Soper had falsely alleged that there were concerns and complaints regarding Levitin's practice, "not out of a concern for patient safety, but rather as retaliation for [her earlier] complaints against Conway and in order to interfere with her practice, which competed with ASA's, Soper's, Loren's, and Conway's practices." *Id.* at 1116. The plaintiffs alleged that Conway and Soper's conduct had caused the revenue earned by Levitin's practice to decrease by approximately 38%. *Id.* at 1119.

¶ 49 The plaintiffs in *Levitin* filed a lawsuit that pertained to the revocation of Levitin's clinical privileges. *Id.* at 1110. The defendants later filed a motion to dismiss the lawsuit and argued therein that the Act protected them from liability for the plaintiffs' alleged damages because "Levitin's peer review process 'met all of the statutory requirements ***' and served the purpose of internal quality control and improving patient care within the hospital." *Id.* at 1120. In addressing the motion to dismiss, the court found that the plaintiffs' allegations "provide[d] plausible grounds *** to doubt that [the] [d]efendants acted under the reasonable belief that their actions were taken in the furtherance of quality healthcare." *Id.* at 1121. Based on this finding, the court concluded that, "[a]lthough evidence adduced in discovery and presented on summary judgment or at trial may cast the case in a different light, [the] [p]laintiffs have pleaded facts that, if true, would deprive [the] [d]efendants of immunity under the [the Act]." *Id.*

¶ 50 Similar to the plaintiffs in *Levitin*, who alleged that Conway and Soper had caused Levitin to be subject to peer review to interfere with Levitin's practice, which had competed with their own, plaintiff in this case alleged in his third amended complaint that defendants had caused him to be subject to peer review to continue to take away his patients and to direct them instead to a hand surgeon who was employed by Riverside Medical Group. More specifically, plaintiff alleged that, prior to 2018, he was the only hand surgeon with clinical privileges at Riverside, as well as

18

that defendants knew that he had current and pre-existing patients whom he treated at Riverside and that physicians unaffiliated with Riverside would also refer patients to him for treatment. Plaintiff further alleged that, in 2018, after another hand surgeon employed by Riverside Medical Group began practicing at Riverside, defendants contacted and solicited his current and pre-existing patients and directed the physicians unaffiliated with Riverside to no longer refer patients to him and to instead refer patients to the hand surgeon employed by Riverside Medical Group.

¶ 51    Also like the plaintiffs in *Levitin*, who alleged that Conway and Soper's conduct had caused Levitin's practice to lose revenue, plaintiff in this case alleged that, because of defendants' conduct, the number of surgeries that he performed at Riverside decreased after the hand surgeon employed by Riverside Medical Group also began practicing at Riverside. Alongside this allegation, plaintiff listed the annual number of hand surgeries that he and the hand surgeon employed by Riverside Medical Group had each performed between 2018 and 2022. The data provided by plaintiff showed that, in 2018, he had performed 185 hand surgeries at Riverside, but that, after Riverside Medical Group had employed the other hand surgeon in 2018, he had performed only 161 hand surgeries at Riverside in 2019 and 86 hand surgeries in 2020. The data also showed that, whereas the annual number of hand surgeries that the hand surgeon employed by Riverside Medical Group had performed between 2018 and 2022 had increased by 408, the annual number of hand surgeries that plaintiff had performed during this same time frame had increased by only 82.

¶ 52    Based on the events and data that plaintiff set forth in his third amended complaint, we find that he sufficiently alleged that defendants had caused him to be subject to peer review to continue to take away his patients and divert them to the hand surgeon employed by Riverside Medical Group, rather than to protect patient and staff safety during the COVID-19 pandemic. As it follows, we further find that plaintiff sufficiently alleged the existence of a sham purpose in relation to the

19

diversion of his hand surgery patients. Based on these findings, it is unnecessary for us to also analyze whether plaintiff's related allegations regarding religious discrimination, retaliation, and Kambic's personal animus toward him also sufficiently showed the existence of a sham purpose. Moreover, we conclude that, because plaintiff sufficiently alleged the existence of a sham purpose, the circuit court erred by determining that defendants were immune under section 10.2 and ordering dismissal pursuant to section 2-619 of the Code.

¶ 53                                    C. Section 2-615 Dismissal

¶ 54        Last, we must consider whether dismissal was warranted under section 2-615 of the Code, for failure to state a claim for relief. As to this issue, we note that, in defendants' combined motion to dismiss, they sought section 2-615 dismissal only as to counts II, IV, and V of the third amended complaint. Thus, we will confine our remaining analysis to these same counts.

¶ 55        1. *Count II—Tortious Interference With Existing and Prospective Business Relations*

¶ 56        "The torts of interference with contractual relations and interference with prospective economic advantage are closely related." *Philip I. Mappa Interests, Ltd. v. Kendle*, 196 Ill. App. 3d 703, 708 (1990). To state a claim for tortious interference with contractual relations, a plaintiff must allege that

> "(1) a current contract was in force and effect between the plaintiff and another party;
> (2) the defendant induced the breach of such contract, or caused a third party not to perform
> a contract, or enter into or continue business relationships with the plaintiff; and (3) the
> interference [was] intentional, causing a contract breach or termination." *Exchange
> National Bank v. Farm Bureau Life Insurance Co. of Michigan*, 108 Ill. App. 3d 212, 214
> (1982).

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." (Emphasis and internal quotation marks omitted.) *Myers v. Levy*, 348 Ill. App. 3d 906, 921 (2004).

¶ 57 Relevant to plaintiff's claim for tortious interference with contractual relations, liability for the tort extends only to situations in which there is a legally binding contract between parties. See *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 468 (2006) ("The relational tort[ ] *** of *** interference with contract *** applies only where there is a legally binding contract between the parties."). Accordingly, courts have refused to find liability for the tort when the plaintiff fails to sufficiently allege the existence of an enforceable contract. See, *e.g.*, *id.* at 469 (stating that the plaintiff could only "lay claim to *** a mere business expectancy" because, although there was evidence of an existing business relationship between the plaintiff and a third party, there was no evidence that the plaintiff had an enforceable contract with that third party); *Lusher v. Becker Brothers, Inc.*, 155 Ill. App. 3d 866, 869 (1987) (finding that the plaintiff did not sufficiently plead the existence of a valid employment contract between him and a third party, despite the fact that the plaintiff alleged that the third party had intended to employ him and he had intended to be so employed).

¶ 58 In this case, plaintiff alleged that he had existing patients whom he treated and that there were also physicians who referred new patients to him for treatment. However, he did not further allege that he had binding contracts with these patients or physicians at the time of defendants' interfering conduct. Moreover, as to such conduct, plaintiff did not allege facts more specific than

21

that, at some point in time, defendants "called, contacted and otherwise solicited" his existing patients and "instructed *** physicians to refer patients to a hand surgeon employed by Riverside" rather than to him. Without more, these allegations fail to inform, for example, whether defendants interfered with plaintiff's alleged business relationships at a time when an enforceable contract was in effect and, as it follows, whether any enforceable contract was actually breached by plaintiff's patients or the referring physicians. Consequently, plaintiff failed to state a claim for tortious interference with contractual relations.

¶ 59    Turning to plaintiff's claim for tortious interference with prospective economic advantage, as defendants point out, Illinois courts have explained that a plaintiff asserting such a claim may not rely only upon proof of a past customer relationship to demonstrate a "reasonable expectancy" of entering into a future business relationship. See, *e.g.*, *Instant Technology, LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014); *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012) ("[A] history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer."). However, this is exactly what plaintiff here did in his third amended complaint. Specifically, he alleged only that he had existing patients who would return to him for treatment, that there were also physicians who would refer new patients to him, and that he had "an ongoing expectation" to continue to treat his existing patients and to receive patient referrals from the other physicians. Because these allegations plausibly showed no more than a past relationship between plaintiff and his patients and referring physicians, we find that he failed to sufficiently demonstrate a reasonable expectancy of future business relationships and to state a claim for tortious interference with these relationships.

¶ 60　　　　　　　　　*2. Count IV—Intentional Interference With Employment Contract*

¶ 61　　　　　　For the tort of intentional interference with contract, "Illinois courts recognize a [qualified] privilege for corporate officers and directors to use their business judgment and discretion on behalf of their corporations." *MGD, Inc. v. Dalen Trading Co.*, 230 Ill. App. 3d 916, 920 (1992). Thus, when a "plaintiff alleges that the defendant, in his capacity as a corporate officer, tortiously interfered with a contract between the plaintiff and that corporation, the plaintiff must plead that the defendant acted outside the qualified privilege he enjoys as a corporate officer to influence the actions of the corporation." *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 175 (2003).

¶ 62　　　　　　To demonstrate that a corporate officer acted outside of his qualified privilege, the plaintiff must allege specific facts that show that the officer engaged in conduct that was unjustified or motivated by actual malice. See *MGD*, 230 Ill. App. 3d at 920. Conduct is unjustified when it is " 'totally unrelated or even antagonistic to the interest which gave rise to [the] privilege.' " *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 47 (quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 158 (1989)). "Actual malice means a positive desire and intention to annoy or injure another person." *Certified Mechanical Contractors, Inc. v. Wight & Co., Inc.*, 162 Ill. App. 3d 391, 401 (1987). In *HPI Health Care*, 131 Ill. 2d at 158-59, the supreme court elaborated on the principles related to the qualified privilege of a corporate officer by explaining that, for example, a hospital management company that had a qualified privilege, based on the management company's role in exercising its business judgment on behalf of the hospital, "would not be justified in inducing a breach of contract solely for the management company's gain, or solely for the purpose of harming [an individual], since such conduct would not have been done to further the hospital's interests."

¶ 63    Here, Riverside is a corporation, and Kambic is an officer of Riverside. Consequently, Kambic enjoyed a qualified privilege to use his business judgment and discretion on behalf of Riverside. As to whether plaintiff sufficiently alleged that Kambic acted outside of his qualified privilege, plaintiff alleged in his third amended complaint that Kambic had induced Riverside to breach the Bylaws out of "self-interest." However, plaintiff failed to specifically identify a way in which Riverside's alleged breach of the Bylaws benefitted Kambic in a way that did not also benefit Riverside. Consequently, we find that plaintiff's allegation that Kambic acted out of "self-interest" is too speculative and conclusory to be availing. See *MGD*, 230 Ill. App. 3d at 921 (concluding that the plaintiffs' allegations were insufficient to overcome a corporate officer's qualified privilege and to state a claim for tortious interference with contract, partly because the plaintiffs had not alleged that the officer had appropriated funds from the corporation for his own personal use or any other specific facts that showed that the officer's actions were motivated by personal gain or totally unrelated to the interests of the corporation).

¶ 64    Additionally, plaintiff alleged that Kambic had induced Riverside to breach the Bylaws "solely from a desire to harm [him]." More specifically, plaintiff alleged that Kambic had induced Riverside's breach to take away his patients and redirect them to a hand surgeon employed by Riverside Medical Group. We earlier found that plaintiff plausibly alleged that defendants acted throughout the course of his peer review process to divert his patients to the hand surgeon employed by Riverside Medical Group. However, because plaintiff himself alleged that Riverside Medical Group is affiliated with Riverside, any potential benefit that Riverside Medical Group might have received from so diverting plaintiff's patients would seem to also have been received by Riverside. Thus, plaintiff failed to sufficiently show that Kambic's alleged interest in harming him was unrelated to Riverside's interest in diverting his patients to the hand surgeon employed

24

by Riverside Medical Group. Due to this failure, plaintiff's present allegations are unavailing. See *Philip I. Mappa Interests*, 196 Ill. App. 3d at 709 (explaining that, to prevail on a claim for tortious interference with contract, the plaintiff must prove that the "defendant had acted with a desire to harm which was unrelated to the interest he was presumably seeking to protect by bringing about the breach").

¶ 65       Next, plaintiff also alleged that Kambic had induced Riverside to breach the Bylaws to discriminate against him based on his religious beliefs and "to promote religious discrimination at Riverside." However, plaintiff failed to allege enough specific facts to support these general allegations. For example, although plaintiff alleged that he was a member of the Nation of Islam, he did not allege whether there were other similarly situated physicians at Riverside who shared his religious beliefs and, if so, how Kambic had treated or had influenced Riverside to treat the similarly situated physicians, in light of their beliefs. Moreover, although plaintiff alleged that he was "the only physician at Riverside who was subject to peer review and had his privileges terminated based upon his request for an exemption to the Covid vaccination," he did not allege whether he was the only physician at Riverside who had requested a religious exemption to the vaccination policy and, if not, how Kambic had treated or had induced Riverside to treat the other physicians who requested the same exemption. Absent such specific allegations, plaintiff's more general allegations that Kambic desired to discriminate against him based on his religious beliefs and to promote religious discrimination at Riverside are conclusory and speculative. Furthermore, the plausibility of the allegations is undercut by plaintiff's acknowledgment in his third amended complaint that, outside of the events at issue in this case, Riverside had granted him an exemption from receiving all vaccinations throughout the 17 years that he had been a staff member there. Thus, we find that his present allegations fail.

25

¶ 66        Plaintiff further alleged that Kambic had induced Riverside to breach the Bylaws "to retaliate against [him] for challenging [Kambic's] unadopted Covid policy," which, plaintiff explained, was Kambic's statement in his September 17 memorandum that "Riverside [would] deny [religious exemption] request[s] for all patient-facing positions where safety risks and legal liability create[d] an undue hardship and increase[d] risk for transmission of the COVID-19 virus among [the] patients and staff." Plaintiff did not specify in his third amended complaint how exactly he allegedly "challenge[d]" this statement by Kambic. However, insofar as plaintiff believed that he had challenged Kambic's statement by submitting a religious exemption request, we note that the request preceded Kambic's statement and, thus, cannot be reasonably said to have been a challenge to the statement.

¶ 67        Moreover, we acknowledge that plaintiff possibly believed that he had challenged Kambic's statement by requesting and participating in the January 18, 2022, hearing regarding the adverse action to his clinical privileges and asking to be provided with the information that Riverside had relied upon in developing the vaccination policy and deciding to take adverse action. To the extent that this was his belief, we further acknowledge that these actions in fact followed Kambic's statement and, thus, might more fairly be said to have been challenges to the statement. Nevertheless, plaintiff never alleged any specific facts that meaningfully showed that Kambic had ever formed the desire to retaliate against him based on these actions. Plaintiff alleged that, following the January 18, 2022, hearing, "[t]wo of the three panelists apologized to [him] *** and stated the decision was essentially out of their control." However, plaintiff did not allege, for example, that these same panelists told him that the decision was "out of their control" because Kambic had predetermined the decision. Nor did plaintiff allege, for further example, that anyone else ever told him that Kambic had taken certain actions to retaliate against plaintiff. Plaintiff also

26

never alleged facts such as whether there were other similarly situated physicians at Riverside who had refrained from challenging Kambic's statement in a similar manner to him and, if so, that Kambic had treated or had influenced Riverside to treat those physicians more favorably than plaintiff. Without additional details of this kind, plaintiff's allegation that Kambic desired to retaliate against him for challenging his statement in the September 17 memorandum amounts to no more than pure speculation. Therefore, we find that plaintiff failed to plausibly show that Kambic acted outside of his qualified privilege as a corporate officer. As it follows, we further find that plaintiff failed to state a claim for intentional interference with employment contract.

¶ 68                    3. *Count V—Intentional Infliction of Emotional Distress*

¶ 69          To state a claim for intentional infliction of emotional distress, a plaintiff must allege facts showing that "(1) the defendant's conduct was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant knew that severe emotional distress was certain or substantially certain to result from such conduct." *Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 596 (2000). Additionally, the plaintiff's allegations "must be specific, and detailed beyond what is normally considered permissible in pleading a tort action." (Internal quotation marks omitted.) *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 155 (1999).

¶ 70          "[M]ere insults, indignities, threats, annoyances, petty oppressions or trivialities" do not constitute extreme and outrageous conduct. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90 (1976). "Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 21 (1992). Additionally, "[t]he distress inflicted must be so severe that no reasonable person could be expected to endure it." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (2000). The determination of whether conduct is extreme

27

and outrageous is made using an objective standard and based on all the applicable facts and circumstances. *Id.* Courts may consider the following factors in assessing whether conduct is extreme and outrageous:

> "the intensity and duration of the distress, defendant's degree of power or authority over the plaintiff, defendant's abuse of a position that gives him actual or apparent power to damage the plaintiff's interests, whether defendant reasonably believed that his objective was legitimate, and defendant's awareness that the plaintiff is susceptible to emotional distress by reason of some physical or mental condition or peculiarity." *Prakash v. Parulekar*, 2020 IL App (1st) 191819, ¶ 47.

¶ 71 Furthermore, although plaintiff in this case is not employed by defendants, because he has clinical privileges at Riverside, we are nevertheless guided by the fact that Illinois courts "hesitate to find that a plaintiff has stated a claim for intentional infliction of emotional distress in employment situations." *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 410 (1999). As this court has itself articulated:

> "Personality conflicts, questioning of job performance and job transfers, whether for disciplinary or management purposes, are unavoidable aspects of employment. Frequently, they produce concern and distress for the affected employee. Yet, if the distress from such incidents was deemed so severe that no reasonable person could be expected to endure it, nearly all employees would have a cause of action for intentional infliction of severe emotional distress." *Heying v. Simonaitis*, 126 Ill. App. 3d 157, 166 (1984).

¶ 72 Nevertheless, there are decisions in which Illinois courts have found plaintiff employees to have prevailed on their claims for intentional infliction of emotional distress, in light of evidence that showed that the plaintiffs' employers engaged in conduct that was coercive. See, *e.g.*, *Pavilon*

28

*v. Kaferly*, 204 Ill. App. 3d 235, 245-47 (1990) (concluding that a plaintiff employee had sufficiently proven her claim of intentional infliction of emotional distress because the available evidence showed that her employer had harassed and coerced her by pressuring her for dates and offering her money in return for sexual favors and had also later fired her and threatened to kill her, rape her, and file a lawsuit to challenge her rights to custody of her only child). There are also decisions in which our courts have found plaintiff employees to have successfully pleaded claims for the same tort, based on the plaintiffs' allegations that their employers retaliated against them. See, *e.g.*, *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 77, 81 (1981) (holding that a plaintiff employee had stated a claim for intentional infliction of emotional distress by alleging, in part, that his employer had coerced him to illegally falsify reports used to bill customers and had later harassed and retaliated against him after he refused to falsify the reports).

¶ 73　　　　Especially pertinent to this appeal, however, is the decision of *Graham*, 318 Ill. App. 3d 736. There, the plaintiff employee alleged that he had complained of safety issues and statutory violations at his employer's nuclear power station to an external commission. *Graham*, 318 Ill. App. 3d at 739. The plaintiff further alleged that, subsequently, his employer began investigating safety violations, harassment, intimidation, and discrimination at its nuclear power station and that, although the employer knew at that time that he was not responsible for any vandalism or harassment, the employer began investigating him anyway. *Id.* The plaintiff also alleged that, throughout the ensuing investigation, the employer knew that the allegations against him were false and, while interviewing other employees, had made "several allegedly defamatory statements," such as that the plaintiff had planted radioactive material outside of designated areas, had " 'beaten *** up' " other employees, had sexually harassed female employees, and was a leader of a gang. *Id.* at 739-40. Additionally, the plaintiff alleged that, during the investigation, he

had been reassigned to an abandoned facility where he had to remain in one room for the entire day "with virtually no work to do." *Id.* at 740.

¶ 74        In addition to his allegations concerning his employer's conduct, the plaintiff in *Graham* also alleged that he suffered "severe mental and emotional distress" because of such conduct. *Id.* Specifically, the plaintiff alleged that he suffered "physical manifestations of [his] job-related distress" and that he had repeatedly informed his employer of his distress. *Id.* The plaintiff further alleged that someone at his employer's employee assistance program had referred him to a therapist at his request and that, later, he also began seeing a psychologist. *Id.* According to the plaintiff, once his employer ended its investigation, it found that the allegations against him had been "unsubstantiated" but never assigned him back to his original position or informed the other employees that the allegations against him were false. *Id.*

¶ 75        The plaintiff in *Graham* sued his employer for intentional infliction of emotional distress and retaliatory discharge. *Id.* at 740-41. On appeal from the section 2-615 dismissal of both claims, the court considered whether the plaintiff had sufficiently alleged that his employer had engaged in extreme and outrageous conduct to state a claim for intentional infliction of emotional distress. *Id.* at 745-49. As an initial matter, the court rejected the plaintiff's claims that his reassignment had constituted extreme and outrageous conduct and characterized the reassignment as part of the "everyday stress of the workplace." *Id.* at 747-48. Nevertheless, the court found that the plaintiff's related allegations of "a sham investigation for the sole purpose of retaliating against him because he reported that [his employer] was violating nuclear safety regulations" were sufficient to show that his employer had engaged in extreme and outrageous conduct. *Id.* at 748. The court also found that the plaintiff had sufficiently pleaded the "second and third elements" of his claim of intentional infliction of emotional distress, based on his allegations that he had suffered severe emotional and

30

mental distress as a result of his employer's conduct; that his employer knew of his susceptibility to distress because he had repeatedly informed the employer, had spoken to his employer's employee assistance program, had requested a therapist, and was treated by a psychologist; and that he had suffered physical manifestations of his distress. *Id.* Consequently, the court concluded that the plaintiff had stated a claim for intentional infliction of emotional distress. *Id.* at 748-49.

¶ 76    In determining that the plaintiff had sufficiently pleaded his claim for intentional infliction of emotional distress, the *Graham* court distinguished the allegations before it from those in *Welsh*, 306 Ill. App. 3d 148. The plaintiffs in *Welsh* were employees who alleged that they had made complaints regarding safety issues and statutory violations at their employer's nuclear power station to management and an external commission and that, subsequently, they were transferred to another facility, demoted, and paid less. *Id.* at 150. The plaintiffs further alleged that, "in retaliation for having complained about conditions and procedures at [the employer's] facility," their employer subsequently demoted them to positions in which they were then assigned " 'demeaning' " and " 'humiliating' " tasks. *Id.*

¶ 77    The plaintiffs in *Welsh* filed a multicount complaint that asserted claims for intentional infliction of emotional distress against their employer, which the circuit court ultimately dismissed pursuant to section 2-615. *Id.* On appeal from the dismissal, the appellate court acknowledged that the plaintiffs' allegations, if true, "may well have been in violation of federal statute [citation] and could easily be found to be an abuse of power." *Id.* at 154. However, the court underscored that, "in the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress." *Id.* The court then found that, "[a]lthough the retaliation and indignities to which the plaintiffs allege[d] they were subjected

31

[were] wholly lacking in social utility," it could not conclude that the employer's alleged conduct was "of such an outrageous character that no reasonable person could be expected to endure it." *Id.* at 155. The court also found that the plaintiffs had failed to sufficiently plead that they suffered severe emotional distress because, although they had alleged that they suffered " 'anxiety, humiliation,' and 'extreme and severe emotional distress,' " they had not alleged facts "from which the level of severity of the emotional distress could be inferred," such as that "they were hospitalized or were required to seek medical care *** [or] that any of them was afflicted with a physical or mental condition rendering him or her particularly vulnerable to emotional distress." *Id.* Based on its findings, the court affirmed the dismissal of the plaintiffs' claims for intentional infliction of emotional distress. *Id.* at 156.

¶ 78         We find that plaintiffs' showing in this case is more akin to that by the plaintiffs in *Welsh* than to that by the plaintiff in *Graham*. As was similarly so in *Graham*, where the plaintiff alleged that his employer had conducted a "sham" investigation, we earlier found in this case that plaintiff sufficiently alleged that defendants conducted a sham peer review process pertaining to the adverse action against his clinical privileges. Nevertheless, unlike the sham investigation in *Graham*, which the plaintiff there alleged had been conducted to retaliate against him, we also earlier found in this case that plaintiff sufficiently alleged that defendants had conducted the sham peer review process for a different reason, which was to usurp his patients. We further found that plaintiff did not sufficiently allege that Kambic desired to retaliate against him, and we now also note that the third amended complaint is devoid of any well-pleaded facts that would sufficiently show that Riverside had such a desire.

¶ 79         Furthermore, unlike the plaintiff in *Graham*, who alleged that his employer's extreme and outrageous conduct had included conducting the sham investigation despite knowing that the

32

allegations against the plaintiff were false and making numerous defamatory statements about him to other employees, plaintiff here did not allege that defendants knew of any false allegations or made any defamatory statements regarding him while conducting the peer review process. Plaintiff did allege that defendants "subjected [him] to demeaning and humiliating comments and behavior regarding his religious beliefs and unvaccinated status." Nevertheless, this allegation is not well-pleaded in that plaintiff failed to more specifically allege, for example, the *exact* comments or behavior to which he was subjected or any other details that would at least reveal more of the nature of said comments and behavior. Moreover, the allegation is akin to those of insults, indignities, and oppressions that Illinois courts have found do not support a finding of extreme and outrageous conduct. See *Harris v. First Federal Savings & Loan Ass'n of Chicago*, 129 Ill. App. 3d 978, 980-81 (1984) (explaining that, to state a claim for intentional infliction of emotional distress, the defendant's conduct must exceed "mere insults, indignities, threats, annoyances, petty oppressions or trivialities" (internal quotation marks omitted)).

¶ 80        We also note that, unlike the plaintiff in *Graham*, who alleged that he been reassigned to an abandoned facility where he had nearly no work to do and was never assigned back to his original position, and unlike the plaintiffs in *Welsh*, who alleged that they had been demoted to positions in which they were then assigned " 'demeaning' " and " 'humiliating' " tasks, plaintiff here admitted in his third amended complaint that Riverside had been prevented from "officially" terminating his clinical privileges and had ultimately amended the vaccination policy to allow religious exemptions for patient-facing staff. Also, although plaintiff alleged that the number of hand surgeries that he performed at Riverside had decreased starting in 2018, he further alleged that he was nevertheless still able to perform hand surgeries at Riverside as late as 2022 and performed as many as 267 hand surgeries that year. Thus, plaintiff's allegations in this regard did

33

not sufficiently show that defendants had engaged in conduct so extreme and outrageous such as to be actionable. Nor do we find that any of his remaining allegations showed the same.

¶ 81    As to whether plaintiff sufficiently pleaded that he suffered severe emotional distress, he alleged that, as a result of defendants' conduct, he experienced "guilt, shame, embarrassment, hopelessness, anguish, fury, humiliation, loss of sleep, decreases in appetite, and other physical manifestations of emotional distress." However, unlike the plaintiff in *Graham* and like the plaintiffs in *Welsh*, plaintiff here never alleged that he had informed defendants of his distress. He also did not allege other facts such as that he had been hospitalized, that he had had to undergo medical treatment for his distress, or that he had any physical or mental conditions that made him particularly vulnerable to emotional distress. Consequently, we find that plaintiff failed to state a claim for intentional infliction of emotional distress and that dismissal pursuant to section 2-615 was warranted.

¶ 82                                    III. CONCLUSION

¶ 83    For the foregoing reasons, we affirm the portion of the Kankakee County circuit court's order dismissing counts II, IV, and V of the third amended complaint, reverse the portion of the order dismissing count I of the complaint, and remand for further proceedings.

¶ 84    Affirmed in part and reversed in part.

¶ 85    Cause remanded.

*Muhammad v. Riverside Healthcare*, **2026 IL App (3d) 240274**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 21-CH-70; the Hon. Lindsay Parkhurst, Judge, presiding. |
| **Attorneys for Appellant:** | Troy A. Lundquist, Stacy Shelly, and Scott A. Hall, of Langhenry, Gillen, Lundquist & Johnson, LLC, of Joliet, for appellant. |
| **Attorneys for Appellee:** | Michael R. Phillips, Katharine P. Lennox, and Chen G. Ni, of McGuire Woods LLP, of Chicago, for appellees. |